JAMES F. MCKAY III, Judge.
| T Curtis Williams appeals his convictions and sentences for attempted second degree murder and aggravated burglary, asserting: (1) the trial court erred by admitting evidence of other crimes; (2) the evidence was insufficient to support his convictions; and (8) the court erred by imposing excessive, consecutive sentences. We affirm his convictions and remand the matter for resentencing consistent with this opinion.
STATEMENT OF CASE
The State of Louisiana on January 20, 2010, charged Curtis Williams with one count each of attempted second degree murder and home invasion. At his arraignment on January 22, 2010, he pled not guilty to both charges. The court found probable cause to hold him for trial and denied his motion to suppress the evidence on March 5, 2010. On September 7, 2010, the State filed notice of its intent to introduce evidence of other crimes. The State subsequently amended count two to charge Williams with aggravated burglary. On October 6, 2010, at the end of a two-day trial, a twelve-person jury found Williams guilty as charged in both counts. On October 28, 2010, the court denied Williams’ motions for new trial and for post-verdict judgment of acquittal. Williams announced readiness for ^sentencing, and the court sentenced him on the attempted murder count to serve forty-nine years at hard labor and on the burglary count to serve twenty-nine years at hard labor, the sentences to run consecutively and without benefit of parole or suspension of sentence. The court denied his motion to reconsider sentence but granted his motion for appeal.
FACTS
Sonya Johnson was shot in the mouth sometime after midnight on November 17, 2009, while standing in the kitchen of her house located at 1700 Shirley Drive in the Algiers area of New Orleans. Both Ms. Johnson and her son, Jalin Williams, identified the defendant Curtis Williams as the person who shot Ms. Johnson.
At trial, Lilly Thomas, Ms. Johnson’s mother, testified that she was speaking on the telephone with her sister and with Ms. Johnson just prior to the shooting, discussing a new residence to which Ms. Johnson intended moving. Ms. Thomas testified that while they were speaking, Ms. Johnson screamed and ended the call. Ms. Thomas stated that she hung up and called the police, and she identified her voice on the tape of a 911 call that the State played.[1] Ms. Thomas gave the police Ms. Johnson’s address and then went to the Shirley Drive residence. She stated that EMS personnel were taking Ms. Johnson out of the residence on a stretcher when she arrived, and Jalin was still inside the residence, but the police would not let her inside the residence. She estimated that Jalin came out of the house approximately half an hour later, and she did not speak with him before he spoke |3with the police. She denied ever telling Jalin what to say to the police, and he did not tell her what *763 happened inside the residence until much later. In addition, Ms. Johnson was in no condition to speak once she got to the hospital.
Tony Thomas, who apparently is no relation to Lilly Thomas, was sitting with a friend in a car parked near the victim’s residence at the time of the shooting. Thomas admitted having prior convictions for possession of marijuana and possession of a controlled dangerous substance without a prescription. He stated that while he and his friend were sitting in the car, talking and listening to music, they heard a loud noise, but because they had the volume on the radio up, they were unsure what they heard. They continued talking for a few minutes, and then they saw a heavyset man wearing a red sweatshirt hurry out of the victim’s house, throw the hood up over his head, and tuck his hands into his sides as he walked away. Soon thereafter, a woman ran out of the house and came up to the car where Thomas and his friend were sitting. Thomas stated that the woman’s face was covered in blood, and she had a hand up to her mouth. The woman spit out blood and a tooth, and she asked them to call 911 because she had been shot. Thomas stated that his friend, who was the woman’s neighbor, got out of the car and called 911. Thomas identified his voice in the background on the 911 tape, and he explained that when the officers arrived, they grabbed him because they thought he was the person who shot the victim, as he was wearing a black hoodie. The woman told the police that Thomas was not the man who shot her. Thomas insisted that he did not know the victim and had not spoken with her since the shooting.
On cross-examination, Thomas estimated that these events occurred around 1:00 a.m. He stated that he had never seen the heavyset man before. He denied 14having taken any drugs or drinking prior to witnessing the man leave the house, and he stated that it was dark when he saw the man. He stated that he did not see anyone climb into the victim’s residence through a window. He testified that when he and his friend heard the noise, his friend looked over at the residence and told him that the light that was on in the house was never on. He stated that a few seconds later, they saw the man leave the house and sort of jog down the street. He admitted that he did not see a weapon or any blood on the man. He testified that the victim never told them that Curtis shot her; she merely said that she had been shot.
Officer Amy Robinson was dispatched to the scene, and she testified that when she arrived, the victim, who had blood all over her, ran up to her car. Officer Robinson shone a light on the victim and discovered that the victim had what looked like a gunshot wound to her upper lip and her hand. Officer Robinson called for an EMS unit and took the victim inside her residence. The victim led Officer Robinson to the kitchen where she indicated that the shooting had occurred. Officer Robinson stated that she saw a pool of blood near a window, and chairs were scattered about as if an altercation had occurred. She stated that the victim asked her to go into a bedroom to retrieve her purse, and when she did so, she found the victim’s son lying in her bed. Officer Robinson testified that she found two shell casings and the victim’s tooth on the kitchen floor, and the kitchen window was cracked. She described the victim as hysterical.[2]
*764 Detective Robert Bachelder responded to the shooting. He testified that when he arrived, he saw the victim and Officer Robinson speaking on the lawn, |sand the victim’s face was covered in blood from a gunshot wound to her face. The victim told him that Curtis Williams, who was her son’s father, shot her. As Detective Ba-chelder walked into the residence, he noticed blood drops on the steps and porch and blood in the hallway and on the walls leading to the kitchen at the rear of the residence. Detective Bachelder testified that he spoke with the victim’s son, who identified Williams as the person who shot his mother. Detective Bachelder radioed this information to his supervisor, who put out an alert for Williams and his vehicle in Orleans and Jefferson Parishes. Williams’ car was located at a residence in Marrero, and Detective Bachelder went to the address, where he spoke with Williams. He also obtained consent from the woman with whom Williams was living to search the residence. Williams agreed to accompany them to the Fourth District police station, where he was advised of his Miranda rights. Detective Bachelder identified the waiver of rights form that Williams signed after indicating that he understood his rights. Williams then denied all knowledge of the shooting.
On cross-examination, Detective Ba-chelder estimated that he arrived at the scene of the shooting at approximately 12:45 a.m. and arrived at Williams’ house at approximately 1:30 a.m. Detective Ba-chelder stated that Williams did not refuse to give a statement; rather, he denied that he shot Ms. Johnson. Detective Bachelder admitted that there was no physical evidence to tie Williams to the shooting; they found no blood on his clothing. On redirect, Detective Bachelder testified that the victim’s son said that his daddy shot his mommy, and the victim also said that Williams shot her. Detective Bachelder indicated that he did not speak with either of the men in the car who saw the man leave the victim’s house.
| ^Detective Andrew Packard testified that he was the lead investigator of the shooting. He stated that when he arrived on the scene, Ms. Johnson was in an ambulance being treated, and he did not speak with her until days later after she had been released from the hospital. He spoke with various witnesses on the scene, including Ms. Thomas, and he spoke with Jalin, who told him that he saw his daddy shoot his mommy. He stated that after learning that Williams was a suspect, he got an arrest warrant for Williams, while Detective Bachelder went to Williams’ home. He described evidence seized from the Marrero residence as a red hooded sweatshirt, blue jeans, a handgun and magazine, and various cartridges. However, Detective Packard never requested ballistics comparison on these items because they were not the same caliber as the gun used to shoot the victim. Detective Packard testified that when he eventually spoke with Ms. Johnson, her account of the shooting was consistent with what he had already learned from his investigation. On cross-examination, Detective Packard testified that he never spoke with Ms. May, the woman with whom Williams was living in Marrero. He testified that Williams said in his statement that he was at home at the time of the shooting.
Dr. Victor Tuckler, qualified as an expert in emergency medicine and toxicology, testified that he was working at University Hospital when Ms. Johnson arrived on November 17, 2009. Ms. Johnson sustained gunshot wounds to her left hand and her upper lip. He stated that the wound on her face transected a part of her tongue, and because she was bleeding profusely, he intubated her. During her treatment, Ms. Johnson received five units *765 of blood. The bullet continued through her mouth and lodged in her neck, fracturing the first two vertebrae in her neck. He testified that if the bullet had hit her pharynx, she would have died, and if it had |7hit her vertebrae, it would have damaged her spinal cord, and she would not have been able to breathe. Dr. Tuckler testified that because the bullet was near the carotid artery, it was too risky to remove it. He testified that the wound to Ms. Johnson’s hand appeared to have occurred when she lifted her hand to her mouth, deflecting the bullet before it traveled through her hand and lodged in her mouth. He stated that she also had a small laceration on her scalp, and her two front teeth were missing. A drug screen of Ms. Johnson showed only the presence of Ketamine, which medical personnel gave her just prior to intubating her. He agreed on cross-examination that he did not know who shot Ms. Johnson. He indicated that he took no photographs of her injuries because he would have needed her permission to do so, and because of her extreme condition, taking photographs was not his priority.
Sonya Johnson identified Williams as the person who shot her. She testified that she first met Williams in August 2001, and they dated up until the day of the shooting. She stated that she and Williams had a son, Jalin, together in 2002, but Williams hid Jalin from his family and did not want them to know Jalin. She stated that Williams also hid Jalin from the woman with whom Williams was living, and Williams only visited her and Jalin when he chose to do so. Ms. Johnson testified that she never sought child support from Williams. She stated that Williams had promised to marry her, but after Hurricane Katrina he took back the ring he had given her. She acknowledged that Williams had relationships with other women during the time that they were together.
Ms. Johnson testified that on the evening before the shooting, Williams came to her residence sometime after 7:00 p.m. She testified that she heard a knock at the back door, and when she looked out through the blinds, she saw ^Williams standing on the steps. He was wearing a red sweatshirt and jeans at the time. He told her that he had come to see Jalin, and she let him in and directed him to the living room where Jalin was. She testified that she remained in the kitchen, cooking, and when Williams came into the kitchen later as he was leaving, she told him that it was best if they stopped seeing each other. Williams then left the house.
Ms. Johnson stated that later that night, she was in the bedroom on the phone with her mother and her aunt when she heard what sounded like wind blowing through the residence. She testified that she grabbed a hammer in her right hand and kept the phone in her left hand. She walked into the kitchen and noticed that the kitchen window was open. She closed the window and nailed it shut, and as she turned around, she saw Williams leaning over the washer and dryer with a gun aimed at her. She stated that he was wearing the same clothing that he had been wearing earlier that night. She testified that she dropped the phone and the hammer, and she screamed. She stated that Williams aimed at her and shot her in the face, and because she had put her hand up, she was shot in the hand and the face. When she did not fall immediately, he hit her on top of her head with the gun handle. She testified that as she fell to the floor, she noticed that Jalin had come into the kitchen. She stated that when she got up from the floor, Williams had fled, and she believed that he had taken Jalin with him because she could not find Jalin. She *766 testified that she noticed the front door was open, and she went outside, where she saw her neighbor sitting in a car with another man. She went to them for help, and when her neighbor got out of his car, she told him that her son’s father had shot her.
|flMs. Johnson testified that when the police arrived, officers took her back inside the residence because she was weak from blood loss. She testified that at this time, she learned that her son was hiding in her bed. She insisted, however, that she did not see her son until several days later after she left the hospital. She testified that she spent time in ICU and had trouble talking because her mouth had been wired shut. She stated that she had already had six surgeries to reconstruct her mouth and face, and she expected to undergo more surgeries.
Ms. Johnson described two prior incidents involving her and Williams. In the first, which occurred in December 2006, she stated that Williams picked her up from work, and as they were driving, he accused her of seeing another man, an accusation that he often made. She stated that he pulled a gun on her and kicked her out of his truck, and after she exited she threw a brick at his truck. She testified that Jalin was in the truck at the time and saw the incident. She stated that she flagged down a police officer and eventually gave the officer a statement, but no action was ever taken on the incident.
The second incident to which Ms. Johnson testified occurred in February 2007. Ms. Johnson testified that she had accompanied Williams to a doctor’s appointment in Metairie, and as they were driving home, her cell phone rang. She stated that Williams grabbed the phone from her and answered it, but when no one replied, he broke the phone in half and threw it out the window of his truck. She stated that he then punched her in the face repeatedly while driving back to the west bank. She stated that he then drew a gun and told her not to say another word. She asked him, “What, are you going to kill me?” When he replied that he was, she told him that if he did, he would have to answer to her children. She testified that Williams continued beating her with his right hand while driving with |inhis left, and then he shoved her to the floor of the truck. She stated that he took her to Behrmann Park, where again he held the gun on her and told her he would shoot her. She stated that someone then drove into the park, and he drove her to the trailer where she was living. He accompanied her inside the trailer. She testified that she used the excuse that she needed to go to the store in order to get away from him, but he drove her there. Once inside, she called 911 and stayed inside the store until the police arrived, but by that time Williams had left. She testified that the beating that Williams inflicted on her left her badly bruised.
On cross-examination, Ms. Johnson testified that on the night of the shooting, she was still on the phone with her mother and her aunt when she discovered Williams standing in her kitchen, holding a gun. She indicated that at that time, Jalin was watching television in the living room. She stated that Williams fired the gun twice. With respect to the February 2007 incident, she stated that she eventually went to court to testify against Williams, but court personnel would not let her into court because of the shirt she was wearing. She testified that the case was ultimately dismissed. She admitted that she had shot at Williams and had stabbed him in the past. She also admitted that although Williams tried to hide Jalin’s existence from his family, eventually Jalin spent a lot of time with Williams’ parents.
*767 On redirect, Ms. Johnson testified that she shot at Williams in 2007 during an argument that occurred in her trailer. She clarified that she did not shoot at him but at the ground during an argument, and the police were not called. As for the stabbing, she testified that Williams beat her in the trailer in front of her son, and she grabbed what she described as a small steak knife and stabbed him. She insisted this altercation arose out of an argument they had over her socializing with |nher friends. She stated that Williams tried to isolate her and keep her from having contact with her family (which included her five children) and her friends. She maintained that she did not have a gun at the time Williams shot her.
Jalin Williams testified that he was eight years old at the time of trial. He stated that on the night that his mother was shot, Williams came to see him earlier that evening while he was doing his homework, and then Williams left. Jalin stated that later, while he was asleep in front of the television, he awoke when he heard his mother screaming. He testified that he jumped up, ran into the kitchen, and saw Williams hitting his mother with a gun. He stated that Williams then ran from the house.
The defense called Sharon Bradley, who testified that on some unknown date, she was walking down Eliza Street when she saw Ms. Johnson standing with a gun in her hand. She stated that she turned around and then heard a gunshot. She turned back around and saw Ms. Johnson firing at Williams’ truck. She stated that Williams fled in his truck while Ms. Johnson continued firing at the truck. On cross-examination, Ms. Bradley admitted that she did not know what year this occurred, but she surmised that it occurred after the storm because there were trailers in the yard, and the gate was down. She admitted that she was not present when Ms. Johnson was shot in November 2009.
Verna Williams testified that she is Williams’ mother. She testified that prior to Jalin’s birth, she knew Ms. Johnson was pregnant, and Ms. Johnson contacted her after Jalin was born. She stated that Williams took her and his father to the hospital to see Jalin on the day he was born or the day after. She stated that she and her husband watched Jalin often when Ms. Johnson was working, taking him to school and picking him up from the bus after school. On cross-examination,12 Ms. Williams stated that although Ms. Johnson has kept Jalin from them since the shooting, before then they often took care of Jalin, especially when Ms. Johnson was working after the storm. Ms. Williams recounted an incident in 2004 when Ms. Johnson called her and told her that she was going to Williams’ job to kill him. Ms. Williams testified that she and her husband went to Williams’ jobsite and found Ms. Johnson there with a bag of knives. She testified that Ms. Johnson stabbed Williams, and other workers detained her. Ms. Williams testified that Ms. Johnson also stabbed all four of the tires on Ms. Williams’ car. She stated that although the police were called, Williams would not press charges against Ms. Johnson because he was concerned about who would take care of Jalin. Ms. Williams admitted that her son did not tell her about the December 2006 or February 2007 incidents.
Denise May testified that she and Williams lived together in Marrero and had lived together for over twenty years. She stated that on the night of the shooting, Williams arrived home sometime between 8:00 and 8:30 p.m., and after talking together for a time, they went to bed around 9:00 p.m. She said that when she awakened sometime between 1:00 and 1:30 *768 a.m., when the police arrived, Williams was still at the house. She insisted that he did not leave that evening.
On cross-examination, Ms. May testified that she told the police that Williams remained at home after he arrived earlier that evening. She testified that when she got up to go to the bathroom sometime between 9:30 and 10:00 p.m., Williams was still in bed. She admitted that she could not say that Williams did not leave their bed because she was sleeping, but he was there when they went to bed and when she got up. She stated that she did not tell the police that she and Williams had gotten into an argument that evening. She stated that she and |13Williams are not married, but they had a thirteen-year-old son. She stated that she knew about Williams’ relationship with Ms. Johnson and that they had a child. She testified that Ms. Johnson called her on the phone to harass her, and Ms. Johnson slashed the tires on her (Ms. May’s) car. She stated that she called the police after Ms. Johnson slashed her tires, but by the time the police responded, Williams had already replaced the tires, and the officer told her that nothing could be done without any evidence. She also testified that Ms. Johnson rammed her car when she, Williams, her daughter, and her son were in the car. She stated that after this incident, Williams flagged down the police, but she had heard no more about this incident. She admitted that she was not present when Ms. Johnson got shot, but she insisted that she is light sleeper, and she would have known if Williams had gotten out of bed that night.
Curtis Williams denied shooting Ms. Johnson, insisting that she lied about the incident. He denied returning to Ms. Johnson’s house after visiting Jalin earlier that evening. On cross-examination, Williams testified that he was home at the time Ms. Johnson was shot, and he did not learn about the shooting until the police arrived and told him she had been shot. He insisted that someone coached Jalin to say that he shot her, although he did not know why either Jalin or Ms. Johnson would lie. With respect to the 2006 incident, Williams denied pointing a gun at Ms. Johnson. He admitted that he threw her out of the truck, but he hit her only after she threw a brick at his truck. He stated that the police took his gun away from him at that time because he had no papers for it. He insisted that he was not arrested in connection with that incident because the police indicated that they would have to arrest both Williams and Ms. Johnson. Instead, the police issued him a summons. As for the 2007 incident, he denied pointing a gun at Ms. 114Johnson. He theorized that Ms. Johnson lied because she had filed a lawsuit against him. He stated: “Ms. Sonya is a fatal attraction, that’s why.”
On rebuttal, the State called Desmond Barnes, Ms. Johnson’s neighbor. He admitted that he had two prior convictions for possession of crack cocaine and that he was incarcerated at the time of trial. He testified that on the night of the shooting, he was sitting outside of his house on Shirley Drive when his neighbor ran up to him, hysterical and begging him to call the police because she had been shot. He testified that she told him that the shooter, who was her son’s father, took her son as well. Barnes testified that just before the victim appeared, he saw a heavyset man wearing a red hoodie running from the house. Barnes testified that the State promised him nothing in exchange for his testimony. On cross-examination, Barnes admitted that he had refused to testify the day before. He testified that he was currently serving time in connection with federal charges and was on supervised release that day. On redirect, Barnes admitted *769 that he did not want to testify because all he did was call 911, and he did not want to jeopardize his family (his wife and four children) who were still living in New Orleans. He reiterated that the State offered him nothing in exchange for his testimony, nor did the State threaten him.
The State recalled Detective Bachelder, who testified that Ms. Johnson was outside of the house when he arrived on the scene. He stated that he found Jalin inside the house sometime after that. He stated that Ms. Johnson did not have an opportunity to speak with Jalin between the time that the officers found him in the bedroom and when Jalin told the officers what he had witnessed. He reiterated that Jalin told him that his daddy shot his momma. Detective Bachelder testified that when he arrived at Williams’ house, Ms. May told him that she and Williams had []riargued earlier that evening. He stated that Ms. May told him that she went to bed around 8:00 p.m., and when she got up around 9:30, she saw Williams in the house. He stated that she told him that she went back to bed, and she had no idea where Williams may have been the rest of the evening.
Deputy Cynthia Phelps of the Jefferson Parish Sheriffs Office testified that she was first officer to arrive at Williams’ house in Marrero, and she called for backup. She stated that she felt the hood of Williams’ pickup truck, and it was warm. She knocked on the door, and Williams answered. She told him that officers from N.O.P.D. were looking for him because they wanted to talk to him, and he agreed to speak with them. She then took Williams to her car and stayed with him until N.O.P.D. officers arrived. On' cross-examination, Deputy Phelps estimated that it took Williams five to ten minutes to answer the door.
DISCUSSION .

Errors Patent

A review of the record for patent errors reveals there are none.[3]

Assignments of Error

Sufficiency of Evidence

The defendant contends that the evidence adduced at trial was insufficient to support his convictions. He does not dispute that an attempted second degree murder and an aggravated burglary occurred. Instead, he asserts that there was no |! ¿physical evidence to tie him to the incident, and the two independent witnesses who saw the purported shooter leave the victim’s house did not identify him.[4]
In reviewing a claim of insufficiency of evidence, courts must apply the standard set forth in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): the Court must determine whether the evidence, viewed in the light most favorable to the prosecution, “was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La.1984). *770 See also State v. Brown, 2003-0897 (La.4/12/05), 907 So.2d 1; State v. Batiste, 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810; State v. Sykes, 2004-1199 (La. App. 4 Cir. 3/9/05), 900 So.2d 156. In addition, when the State uses circumstantial evidence to prove the elements of the offense, “La. R.S. 15:438 requires that ‘assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.’” State v. Neal, 2000-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657. See also Brown; Batiste; Sykes.
The defendant was convicted of attempted second degree murder and aggravated burglary. Second degree murder is defined in pertinent part by La. R.S. 14:30.1 as “the killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm.” An attempt is defined by La. R.S. 14:27 as being committed when “[a]ny person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending toward the accomplishing of his object.” Aggravated burglary is defined in pertinent part by [l7La. R.S. 14:60 as “the unauthorized entering of any inhabited dwelling ... with the intent to commit a felony or any theft therein, if the offender ... (3) Commits a battery upon any person while in such place, or in entering or leaving such place.”
The defendant contends that the evidence did not prove beyond a reasonable doubt that he was the perpetrator of these crimes. The sufficiency standard to be employed when a defendant disputes proof of identity was discussed by this court in State v. Stewart, 2004-2219, p. 6 (La.App. 4 Cir. 6/29/05), 909 So.2d 636, 639:
When identity is disputed, the State must negate any reasonable probability of misidentification in order to satisfy its burden under Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893; State v. Woodfork, 99-0859 (La.App. 4 Cir. 5/17/00), 764 So.2d 132. The reviewing court must examine the reliability of an identification according to the test set out in Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977): (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness’ degree of attention; (3) the accuracy of the witness’ prior description of the assailant; (4) the level of certainty demonstrated by the witness; and (5) the length of time between the crime and the confrontation. See State v. Brealy, 2000-2758 (La.App. 4 Cir. 11 /7/01), 800 So.2d 1116.
See also State v. Mathieu, 2007-0204 (La. App. 4 Cir. 2/27/08), 980 So.2d 716.
The defendant contends that the evidence was insufficient to prove that he was the perpetrator of the crimes. He points out that although the police seized his red sweatshirt and his jeans, no blood was found on them. He notes that the police did not attempt to find any fingerprints on the kitchen window that was broken, purportedly to allow the assailant to enter the victim’s residence. He asserts that the two witnesses who saw the assailant leave the residence could not identify him. He also notes that although the victim was speaking with her mother at the time 118she discovered the perpetrator in her house, she did not tell her mother that the appellant was in her house. He concludes that there was a reasonable possibility that he was not the assailant: thus, the State did not prove beyond a reasonable doubt that he was the perpetrator.
Even though there was no physical evidence to link the appellant to the crimes, the victim positively identified him as the perpetrator. As noted by this court *771 in State v. Jones, 2011-0649, p. 3 (La.App. 4 Cir. 10/19/11), 76 So.3d 608: “In the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness’s testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 2002-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79. Under the Jackson standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court. State v. Juluke, 98-341 (La.1/8/99), 725 So.2d 1291, 1293.” In addition, the victim’s son identified the appellant as the man whom he saw hitting his mother in the head when he ran to the kitchen upon hearing his mother scream. The defendant argues that it is debatable whether the victim’s son was coached to identify the defendant as the perpetrator. However, the evidence adduced at trial showed that the son disappeared after the shooting and was found by a police officer hiding in the victim’s bed, and all parties testified that neither the victim nor her mother, who arrived on the scene, had an opportunity to speak -with the son before he spoke with the police and identified the defendant. Given this testimony, the jury could have easily found that the victim’s and her son’s identification of the defendant was credible. As noted by this Court, a fact finder’s credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence. State v. Johnson, 2009-0259 (La.App. 4 Cir. 9/16/09), |1322 So.3d 205 [5]; State v. Huckabay, 2000-1082 (La.App. 4 Cir. 2/6/02), 809 So.2d 1093. The jury’s credibility finding was not contrary to the evidence.
The cases that the defendant cites in support of his argument are distinguishable and do not mandate the reversal of his convictions. In State v. Chambers, 2005-1517 (La.App. 3 Cir. 5/24/06), 933 So.2d 200, the court vacated the defendant’s manslaughter conviction resulting from a death that occurred when the victim overdosed on oxycodone. Although the evidence showed that the defendant sold some of the drug to others who then gave it to the victim, there was evidence to show that the amount of the drug in the victim’s system was so large that it was likely that he obtained the fatal dose from someone other than the defendant. In State v. Monds, 91-0589 (La.App. 4 Cir. 1/14/94), 631 So.2d 536, the defendant was convicted of murder based solely on circumstantial evidence. This Court reversed his conviction, finding that the circumstantial evidence did not show beyond a reasonable doubt that the defendant was the murderer. Likewise, in State v. Shapiro, 431 So.2d 372 (La.1982), the Court found that the circumstantial evidence adduced at trial was insufficient to support the defendant’s murder conviction.
Here, unlike in the circumstantial evidence cases cited by the defendant, there were two witnesses who positively identified the defendant as the perpetrator. The jury chose to believe their testimony, and there is nothing in the record to show that this finding was contrary to the evidence. The State presented sufficient 12nevidence to support the jury’s finding that the defendant was the person who broke into the victim’s home and shot her. This assignment of error has no merit.[6]

*772
Other Crimes Evidence

The defendant contends that the trial court erred by allowing the victim to testify concerning two prior incidents involving her and the defendant which involved domestic violence. He argues that this evidence was highly prejudicial and not relevant.
The State admitted evidence of the two prior incidents involving the defendant and the victim pursuant to La. C.E. art. 404 B(l), which provides:
Except as provided in Article 412 [not applicable here], evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to the conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
Generally, evidence of other crimes is not admissible to show that a defendant has acted in conformity with his bad character. Such evidence is only admissible if the State shows an independent and relevant basis for it, namely those grounds set forth in La. C.E. art. 404 B(1). State v. Lee, 2005-2098 (La.1/16/08), 976 So.2d 109. The State must provide notice to the defendant prior to trial of its to introduce such evidence, and the defendant is entitled to a hearing during which the State must prove that the defendant committed the other acts. Lee; State v. Prieur, 277 So.2d 126 (La.1973). The State must show that the evidence will be offered to prove a material fact genuinely at issue, and the probative value of such evidence must outweigh its prejudicial effect. Lee; State v. Hatcher, 372 So.2d 1024 (La.1979). In addition to the grounds listed in art. 404 B(l), evidence of other crimes is also admissible to show modus operandi, “particularly when the modus operandi employed by the defendant in both the charged and the uncharged offenses is so peculiarly distinctive one must logically say they are the work of the same person.” Lee, at pp. 44-45, 976 So.2d at 139.
Even if the State is able to prove that evidence of other crimes is admissible under art. 404 B (1), the court may exclude evidence that fits within these guidelines if its probative value is substantially outweighed by prejudicial effect, or if it would confuse the jury or waste the court’s time. See La. C.E. art. 403; Lee; Miller. As noted by the Court in State v. Rose, 2006-0402, p. 13 (La.2/22/07), 949 So.2d 1236, 1244:
Any inculpatory evidence is “prejudicial” to a defendant, especially when it is “probative” to a high degree. State v. Germain, 433 So.2d 110, 118 (La.1983). As used in the balancing test, “prejudicial” limits the introduction of probative evidence of prior misconduct only when it is unduly and unfairly prejudicial. Id. See also Old Chief v. United States, 519 U.S. 172, 180, 117 S.Ct. 644, 650, 136 L.Ed.2d 574 (1997)(“The term ‘unfair prejudice,’ as to a criminal defendant, speaks to the capacity of some conceded *773 ly relevant evidence to lure the factfin-der into declaring guilt on a ground different from proof specific to the offense charged.”).
In Rose, the defendant had previously been convicted of manslaughter in the stabbing death of his first wife and appealed his manslaughter conviction in the 122strangulation death of his second wife. In addition to introducing evidence of the manslaughter conviction, the State introduced evidence of the defendant’s conviction for violent acts against his first wife before her death as well as evidence of violent acts committed against the second wife (the victim in the case) during their separation. This Court reversed the defendant’s conviction, finding that the acts against the first wife were not similar enough to be admissible in the second degree murder trial involving his second wife. State v. Rose, 2005-0896 (La.App. 4 Cir. 1/18/06), 925 So.2d 34. On writs, the Court reversed, finding that this evidence was admissible both to show motive and identity (there were no independent witnesses to the murder).
Likewise, in Colbert, this Court found that the trial court did not err by allowing the introduction of prior domestic crimes against one of the victims involved in the crime, which resulted in the other victim’s murder. The defendant accosted his ex-girlfriend and her male companion as they walked to her apartment, kidnapped his ex-girlfriend, and shot and killed her companion. This court found that the State gave sufficient pretrial notice of the prior crimes, proved by clear and convincing evidence that the defendant had committed them, and showed that the probative value of the other crimes to show intent outweighed their prejudicial effect. This Court rejected the defendant’s argument that evidence of his actions against the kidnap victim was not admissible at his murder trial because the acts were not committed against the murder victim, noting that the State had to prove the defendant’s intent to kill or inflict great bodily harm. This Court noted that the evidence of his bad acts toward his ex-girlfriend showed his continuing intent to keep her from leaving him and from seeing other men; in most of these incidents, the appellant threatened to harm both Ms. Alexander and any man with l^whom he caught her. Jefferson’s murder and Ms. Alexander’s attempted kidnapping were the last incidents in the appellant’s escalating attacks on Ms. Alexander. As such, evidence of the prior incidents was relevant to show the appellant’s intent to murder Jefferson as well as his motive for doing so. Colbert, 2007-0947 at pp. 19-20, 990 So.2d at 88. This Court also found that the probative value of this evidence outweighed its prejudicial effect.
In State v. Moore, 440 So.2d 134 (La. 1983), the defendant was charged with attempted forcible rape and attempted second degree murder. The State sought to introduce evidence of unrelated attacks on other young women in the area where the charged offenses occurred. The Court stated that in order to introduce this evidence to show modus operandi, “the method of commission of both the charged and uncharged crime must be so distinctly similar that one may logically infer that the same person committed both crimes.” Id. at 137. Our Louisiana Supreme Court noted that these similarities included the time, place, and manner of commission. The Court further noted that in employing a balancing test to see if the evidence should be admitted, “[t]he greater the degree of similarity of the offenses, the more the evidence enhances the probability that the same person was the perpetrator, and hence the greater the evidence’s probative value, which is to be ultimately weighed *774 against its prejudicial effect.” Id. at 137-138. The Court further stated:
Thus, the positive identification of a defendant as the perpetrator of a distinctively similar previous crime is often permitted to enhance the otherwise uncorroborated identification of that person as the perpetrator of the charged crime. In such cases, the evidence of the uncharged crime has much higher relevance and far greater probative value than evidence which merely indicates that the defendant has a propensity to engage in all kinds of criminal activity.
19AId. at 138. The Court found that the State proved by clear and convincing evidence that the defendant committed the other crimes, and evidence of them was admissible to corroborate the victim’s identification of her attacker.
By contrast, in State v. Hills, 99-1750 (La.5/16/00), 761 So.2d 516, the defendant was charged with the murder of a five-year-old girl who sustained sexual trauma. The State sought to introduce evidence of non-consensual sexual conduct with older females (aged fifteen to over forty), where the defendant was identified as the person who offered rides to these females and then forced them to engage in sexual conduct, sometimes using physical force to accomplish the act. The Court found that this evidence was inadmissible because the prior incidents were not sufficiently similar to the facts of the murder.
Here, the State’s notice of intent to introduce evidence of these prior incidents alleged this evidence was pertinent to the issues of identity, motive, intent, plan and absence of mistake or accident. At the pretrial hearing on the State’s motion to introduce this evidence, the parties stipulated that if called, the officers involved in these prior incidents would testify consistently with what was contained in the police reports of these two incidents. The Court then found that this evidence fell within the parameters of Prieur and that its prejudicial effect was outweighed by its highly probative nature. At trial, the defense disputed that the appellant was the perpetrator of the offenses. In addition, because the State charged the appellant with attempted second degree murder and aggravated burglary, it had the burden of showing the appellant’s intent to commit both crimes, and the evidence of the other crimes was used to support a finding of both ^identity and intent, as well as motive for the attack. As this Court found in Colbert, this evidence was admissible.
The appellant argues that this evidence was not admissible because no convictions resulted from either of these incidents. However, as per the very terms of La. C. Evi. art. 404 B, admissible evidence is not limited to only those instances where a conviction has resulted. He next cites State v. Pittman, 95-382 (La.App. 5 Cir. 10/1/96), 683 So.2d 748, where the court found that evidence of a prior theft of a vehicle was not admissible in a case where the defendant was charged with aggravated rape, attempted murder, kidnapping, and carjacking, and he confessed to the charges. The court also noted that although the admission of this evidence was error, it was harmless in that case. By contrast, here the issue of identity was hotly contested at trial. He also cites State v. Morgan, 99-1895 (La.6/29/01), 791 So.2d 100, where the Court in a per cu-riam opinion reversed the defendant’s conviction because it found that evidence of a prior sexual assaults for which the defendant had been convicted and to which he referred during the aggravated rape for which he was being tried was not admissible. Not noted by the appellant, however, was the Court’s finding that although this evidence might be admissible under Pri- *775 eur, it was not admissible in that case because it was admitted only to show the lustful disposition of the defendant and to negate the defense of consent. Here, as noted above, there were at least two, possibly three bases under La. C. Evi. art. 404 B(l) for which the evidence of these prior incidents involving the same victim was admissible.
The defendant finally argues that this evidence should not have been admitted because it was highly prejudicial. The trial court specifically found otherwise, ruling that although the evidence was prejudicial, the prejudice was | ^outweighed by its highly probative value. Given the circumstances of the prior incidents and of the present offenses, as in Colbert, the trial court here did not err by so finding. This assignment of error has no merit.

Excessive Sentences

By his final assignment of error, the defendant contends that the trial court imposed excessive sentences, both as to the length of the sentences that the court imposed and the court’s order that they be served consecutively. The court sentenced the defendant on the attempted murder conviction to serve forty-nine years at hard labor, one year less than the maximum sentence (see La. R.S. 14:27, 14:30.1), and to serve twenty-nine years at hard labor on the aggravated burglary conviction, one year less than the maximum sentence (see La. R.S. 14:60).
In State v. Smith, 2001-2574, p. 7 (La.1/14/03), 839 So.2d 1, 4, the Court set forth the standard for evaluating a claim of excessive sentence:
Louisiana Constitution of 1974, art. I, § 20 provides, in pertinent part, that “[n]o law shall subject any person to ... excessive ... punishment.” (Emphasis added.) Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness. State v. Sepulvado, 367 So.2d 762, 767 (La.1979). A sentence is unconstitutionally excessive when it imposes punishment grossly disproportionate to the severity of the offense or constitutes nothing more than needless infliction of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La.1980). A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. State v. Cann, 471 So.2d 701, 703 (La.1985). On appellate review of a sentence, the relevant question is not whether another sentence might have been more appropriate but whether the trial court abused its broad sentencing discretion. State v. Walker, 00-3200, p. 2 (La.10/12/01), 799 So.2d 461, 462; cf. State v. Phillips, 02-0737, p. 1 (La.11/15/02), 831 So.2d 905, 906.
19nSee also State v. Johnson, 97-1906 (La.3/4/98), 709 So.2d 672; State v. Baxley, 94-2982 (La.5/22/95), 656 So.2d 973; State v. Nix, 2007-1431 (La.App. 4 Cir. 6/18/08), 987 So.2d 855; State v. Batiste, 2006-0875 (La.App. 4 Cir. 12/20/06), 947 So.2d 810.
In Batiste, at p. 18, 947 So.2d at 820, this Court further explained:
An appellate court reviewing a claim of excessive sentence must determine whether the trial court adequately complied with the statutory guidelines in La.C.Cr.P. art. 894.1, as well as whether the facts of the case warrant the sentence imposed. State v. Landry, supra [871 So.2d 1235 (La.App. 4 Cir.2004) ]; State v. Trepagnier, 97-2427 (La.App. 4 Cir. 9/15/99), 744 So.2d 181. However, as noted in State v. Major, 96-1214, p. 10 (La.App. 4 Cir. 3/4/98), 708 So.2d 813:
The articulation of the factual basis for a sentence is the goal of Art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual ba *776 sis for the sentence imposed, resen-tencing is unnecessary even when there has not been full compliance with Art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982). The reviewing court shall not set aside a sentence for excessiveness if the record supports the sentence imposed. La.C.Cr.P. art. 881.4(D).
If the reviewing court finds adequate compliance with art. 894.1, it must then determine whether the sentence the trial court imposed is too severe in light of the particular defendant as well as the circumstances of the case, “keeping in mind that maximum sentences should be reserved for the most egregious violators of the offense so charged.” State v. Landry, 2003-1671 at p. 8, 871 So.2d at 1289. See also State v. Bonicard, 98-0665 (La.App. 4 Cir. 8/4/99), 752 So.2d 184.
Here, at the sentencing hearing, the prosecutor reminded the court that because the defendant committed the offenses with a gun, the minimum sentences he could receive as per La.C.Cr.P. art. 893.3 E(l)(a) and (b), would be twenty | ssyears.[7] He asked that the court impose the maximum sentences on both counts, noting that if the victim’s hand had not deflected the bullet, she could have been killed. Defense counsel countered that because the defendant had no prior convictions, the court should impose the minimum sentences. The court then recounted the circumstances of the offenses, which included the defendant shooting his son’s mother in front of his son. The court noted that it might have imposed a lesser sentence if the appellant had accepted an earlier plea offer, but if it had, it would have been because the court would not have been fully aware of the circumstances of the case. The court, noting that the appellant deserved maximum sentences, imposed sentences on both counts that were one year less than the maximum sentences. The court also imposed the sentences to run consecutively, informing the defendant that he would serve seventy-eight years at hard labor without benefits of parole or suspension of sentence. Although the court did not mention La. C.Cr.P. art. 894.1, the transcript shows that the court complied with its mandate.
The defendant first argues that his sentences are excessive because they are to be served consecutively. La. C.Cr.P. art. 883 provides in part: “If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or plan, the terms of imprisonment shall be |29served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently.” As this Court noted in State v. Jefferson, 2004-1960, p. 39 (La.App. 4 Cir. 12/21/05), 922 So.2d 577, 604:
Although Louisiana law favors concurrent sentences for crimes committed as part of a single transaction, a trial judge *777 retains the discretion to impose consecutive sentences on the basis of other factors, including the offender’s past criminality and violence in the charged crimes. State v. Thomas, 98-1144, p. 1 (La.10/9/98), 719 So.2d 49; State v. Dempsey, 2002-1867, p. 5 (La.App. 4 Cir. 4/2/03), 844 So.2d 1037, 1040, writ denied, 2003-1917 (La.6/25/04), 876 So.2d 823. “Consecutive sentences for crimes arising out of the same act are not per se excessive if other appropriate factors are considered.” Dempsey, 2002-1867 at p. 5, 844 So.2d at 1040. However, “[w]hen consecutive sentences are imposed for crimes arising out of the same act, the trial court must articulate particular justification for such a sentence beyond a mere articulation of the standard sentencing guidelines set forth in La.C.Cr.P. art. 894.1.” Id.
Here, the two counts of which the defendant was convicted arose out of the same act; thus, the court had to set forth reasons for ordering that the sentences be served consecutively. The sentencing transcript indicates that the trial court gave no additional reasons when it imposed the consecutive sentences. The State’s brief does not address this issue. Thus, the defendant’s claim that the record does not support the consecutive sentences has merit. Accordingly, we vacate the defendant’s sentences and remand for resen-tencing. See Jefferson.
The defendant also argues that the actual terms of years on both counts are excessive. This court and others have upheld sentences of fifty years for attempted |3nsecond degree murder. See Nix (the defendant, who had a prior criminal history, stabbed the victim and also stabbed another person, killing him, a few weeks prior to the offense); State v. Robicheaux, 03-1063 (La.App. 5 Cir. 12/30/03), 865 So.2d 149 (the defendant shot at the victim during an attempted armed robbery; the court also upheld a forty-nine- and-a-half-year-sentence for attempted armed robbery); State v. Pyke, 95-919 (La.App. 3 Cir. 3/6/96), 670 So.2d 713 (the defendant, who had a prior conviction, shot the victim in the back with no provocation); State v. Davis, 93-0663 (La.App. 4 Cir. 2/25/94), 633 So.2d 822 (the defendant, who shot three people while trying to rob them, was convicted of two counts of attempted second degree murder and one count of attempted armed robbery); State v. Hill, 431 So.2d 871 (La.App. 2 Cir.1983) (the defendant, a mildly-retarded psychotic first-offender, lured a jailer close to his cell and slashed him with a razor).
Although some of the defendants in the cases cited above had prior criminal histories or perpetrated crimes on more than one person, the present case is analogous to Robicheaux, where the defendant attempted to murder the victim while engaged in another violent crime (attempted armed robbery in Robicheaux, aggravated burglary here). Considering the circumstances of this case, the forty-nine-year sentence imposed by the trial court for the defendant’s attempted second degree murder conviction is not excessive.
The trial court did not impose an excessive sentence for the defendant’s aggravated burglary conviction. In State v. Robinson, 2001-1458 (La.App. 4 Cir. 4/24/02), 818 So.2d 246, this Court upheld a fifty-year sentence as a second offender on a defendant who forcibly entered the elderly victim’s home with an accomplice, pushed her down, threatened to kill her, stole money from her, and ]ai forcibly removed her wedding ring from her hand. Likewise, in State v. Hawthorne, 454 So.2d 285 (La.App. 4 Cir.1984), this Court upheld the maximum thirty-year sentence on a defendant who entered the victim’s home while she and her baby slept, threatened *778 to kill the baby, choked the woman, and stole money from her purse before fleeing. The circumstances of this case are more egregious than those in Robinson and Hawthorne in that the defendant shot the victim in the face, and it was only the victim’s reaction of putting her hand to her face that deflected the bullet, thereby saving her life. The term of the defendant’s aggravated burglary sentence is not excessive.
CONCLUSION
The assignments of error concerning the defendant’s convictions have no merit. Accordingly, we affirm both of the defendant’s convictions. We also find that the terms of years that the court imposed for both sentences are not excessive. However, because the court failed to give reasons for ordering that these sentences be served consecutively, we vacate the defendant’s sentences and remand the case for resentencing consistent with this opinion.
CONVICTIONS AFFIRMED; SENTENCES VACATED AND REMANDED FOR RESENTENCING

. The parties stipulated that exhibit S-l, the 911 tape that was played for the jury, was the 911 tape of this incident.

. Officer Shaheed Mohamed, a crime lab technician, identified exhibits he retrieved from the residence as well as several photographs he took of the scene.

. Although La. R.S. 14:60 does not prohibit eligibility for parole, probation, or suspension of sentence, because aggravated burglary is a crime of violence, and the appellant discharged a weapon during the commission of the crime, as per La.C.Cr.P. art. 893.3 E(2), his sentence must be imposed without eligibility for these benefits. Prior to trial, the State filed a motion to invoke the firearm sentencing provisions of La.C.Cr.P. art. 893.3

. When a defendant raises sufficiency of evidence as well as other assignments of error, a reviewing court should first determine if the evidence adduced at trial is sufficient. See State v. Hearold, 603 So.2d 731 (La. 1992); State v. Shaw, 2007-1427 (La.App. 4 Cir. 6/18/08), 987 So.2d 398.

. Writ den. 2009-2263 (La.4/16/10), 31 So.3d 1054

. In addition to this evidence, the jury was aware of the acrimonious nature of the relationship between the defendant and the victim through testimony concerning the prior incidents of violence between the two. Although the defendant contends in another assignment of error that this evidence was inadmissible, this Court must consider all evidence, whether deemed to be admissible or not, when *772 determining whether the evidence was sufficient to support the jury’s verdict. See Hea-rold; Jones.

. Art. 893.3 E(l) provides:
E. (l)(a) Notwithstanding any other provision of law to the contrary, if the defendant commits a felony with a firearm as provided for in this Article, and the crime is considered a violent felony as defined in this Paragraph, the court shall impose a minimum term of imprisonment of ten years. In addition, if the firearm is discharged during the commission of such a violent felony, the court shall impose a minimum term of imprisonment of twenty years.
(b) A "violent felony” for the purposes of this Paragraph is: second degree sexual battery, aggravated burglary, carjacking, armed robbery, second degree kidnapping, manslaughter, or forcible rape.