**STATE OF LOUISIANA**     &#42;   **NO. 2019-KA-0330**

**VERSUS**        &#42;

             **COURT OF APPEAL**

**TROY VARNADO**      &#42;

             **FOURTH CIRCUIT**

          &#42;

             **STATE OF LOUISIANA**

      &#42; &#42; &#42; &#42; &#42; &#42; &#42;

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 534-923, SECTION "F"
Honorable Robin D. Pittman, Judge
&#42; &#42; &#42; &#42; &#42; &#42;
**Judge Joy Cossich Lobrano**
&#42; &#42; &#42; &#42; &#42; &#42;

(Court composed of Judge Terri F. Love, Judge Joy Cossich Lobrano, Judge Tiffany G. Chase)

*Love, J., concurs in the result*
*Chase, J., concurs in the result*

Leon Cannizzaro
District Attorney
Donna Andrieu
Kyle Daly
DISTRICT ATTORNEY'S OFFICE
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

   COUNSEL FOR STATE/APPELLEE

Mary Constance Hanes
LOUISIANA APPELLATE PROJECT
P. O. Box 4015
New Orleans, LA 70178-4015

Troy L. Varnado
Louisiana State Penitentiary
Camp C Bear #3
Angola, LA 70712

   COUNSEL FOR DEFENDANT/APPELLANT

              **AFFIRMED.**
            **JANUARY 29, 2020**

Defendant, Troy Varnado ("Defendant") has filed the instant appeal seeking to overturn the jury's verdict convicting him of second-degree murder, second-degree kidnapping, and obstruction of justice. After reviewing the facts and applicable law, and for the reasons that follow, we affirm Defendant's convictions.

**PROCEDURAL BACKGROUND**

On May 22, 2017, Defendant and Thayon Samson ("Thayon") were indicted on the following charges: 1) second-degree murder[1] of Lindsay Nichols ("Victim"); 2) second-degree kidnapping[2] of Victim; and 3) obstruction of

---

[1] La. R.S. 14:30.1 states in pertinent part:

   A. Second degree murder is the killing of a human being:
   > (1) When the offender has a specific intent to kill or to inflict great bodily harm; or
   > (2) When the offender is engaged in the perpetration or attempted perpetration of aggravated or first degree rape, forcible or second degree rape, aggravated arson, aggravated burglary, aggravated kidnapping, second degree kidnapping, aggravated escape, assault by drive-by shooting, armed robbery, first degree robbery, second degree robbery, simple robbery, cruelty to juveniles, second degree cruelty to juveniles, or terrorism, even though he has no intent to kill or to inflict great bodily harm.

[2] La. R.S. 14:44.1 states in pertinent part:

   A. Second degree kidnapping is the doing of any of the acts listed in Subsection B wherein the victim is:
   * * *

1

justice.[3] In addition, Defendant was charged with acting as an accessory after the fact,[4] while co-defendant Thayson was charged with soliciting Defendant's murder.[5] On May 30, 2017, Defendant appeared for arraignment and entered pleas of not guilty. Defendant unsuccessfully moved to suppress the admission of his cell phone records obtained pursuant to a search warrant.

Trial commenced on September 17, 2018. Defendant filed a request for a unanimous verdict, which the district court denied because, under the law of Louisiana as it existed on the date of the crime, a unanimous verdict was not required. After deliberations, the jury returned its verdicts: to the charge of second-degree murder, eleven of the twelve jurors returned a verdict of guilty; to the charges of second-degree kidnapping and obstruction of justice, the jury's verdict was unanimous.

---

(3) Physically injured or sexually abused;
* * *
B. For purposes of this Section, kidnapping is:
(1) The forcible seizing and carrying of any person
from one place to another[.]

[3] La. R.S. 14:130.1 provides in pertinent part:

A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding as described in this Section:

(1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance[.]

[4] On the morning of trial, the State dismissed the charge of acting as an accessory after the fact.

[5] On September 7, 2018, co-defendant Thayon pled guilty to the reduced charge of manslaughter and guilty as charged to second-degree kidnapping, obstruction of justice, and solicitation of murder.

2

The district court denied Defendant's motions for new trial and post-verdict judgment of acquittal. On November 8, 2018, Defendant was sentenced to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence for the second-degree murder conviction. In connection with the second-degree kidnapping conviction, Defendant was sentenced to serve forty years at hard labor without the benefit of probation, parole, or suspension of sentence for the first two years. Finally, with respect to Defendant's obstruction of justice conviction, the court sentenced Defendant to forty years in prison at hard labor, with all sentences to run concurrently and with credit for time served. Thereafter, the court granted Defendant's motion for appeal.

**TRIAL TESTIMONY**

The State's first witness, Sergeant Merrell Merricks, a twenty-two-year veteran with the New Orleans Police Department ("NOPD"), was assigned to the "Communication Division, Custodian of Records." His testimony authenticated two 9-1-1 calls made in connection with Victim's homicide on the morning of June 21, 2015. The first call was made by Victim at 4:45 a.m. and lasted until 4:58 a.m. The second 9-1-1 call reported a stalled vehicle on the side of the road but was upgraded to a burning vehicle when the New Orleans Fire Department ("NOFD") arrived on the scene at 7:30 a.m.

After Victim' 9-1-1 call was played for the jury, Sgt. Merricks verified Victim's words: "He tried to do something to me that I didn't want to do." In another part of the call, Victim stated, "He's got a gun. He's in my face. He took

3

my keys." Sgt. Merricks confirmed that Victim did not identify the person whose actions she was describing but two men were heard having a conversation in the background. The men were threatening Victim, not one another.

Sgt. Merrick testified that a male voice is heard "hurling" bad language at Victim. When the dispatcher asked who that person was, Victim said he was "a person that I met once." Victim stated multiple times, "He is approaching my car; he has my gun; he took my things out of my car." Victim also informed the dispatcher that her assailants were "shooting at her," but no shots are heard on the tape. In addition, Victim stated, "He just pointed the gun at me"; "I'm about to shoot him"; "he's got a gun"; "he's in my face." Sgt. Merricks believed that Victim referred to two persons when she stated, "Both of y'all get away from me or I will blow both of y'all away."

Eyewitness H.C. testified for the State. H.C. provided information to Crimestoppers in June 2015, and later to the NOPD, that he saw two men driving away from a burning car at the location where Victim's vehicle was found in an "old model Jaguar" in the direction of the bridge to the west bank of New Orleans. H.C. stated it was light enough for him to see what he witnessed. H.C. saw a "Mohawk gentleman" get into the passenger side of the Jaguar and was the same man that he saw on the television program, "First 48." H.C. also saw the driver of the Jaguar, describing the man as "fat," with "short, tight dreadlocks" tied into a short ponytail. H.C. only saw the vehicle and its occupants for "a few seconds," but was sure that the vehicle was a "97" or "98" Jaguar.

4

Dr. Cynthia Gardner, accepted as an expert in the field of forensic pathology, testified that she performs autopsies of people who die in Orleans Parish. In June 2015, Dr. Gardner performed an autopsy on Victim and prepared an autopsy report.

Dr. Gardner testified that Victim suffered nine gunshot wounds: one to the head, six to the neck, and two to the hand. Evidence of strangulation was also present along with "multiple evidence of blunt force injury," and burning that occurred post-mortem. The toxicology report indicated alcohol in Victim's system. Dr. Gardner estimated that the muzzle of the gun that shot Victim multiple times was held approximately two feet away.

Detective Robert Barrere, a fourteen-year veteran of the NOPD, was lead detective assigned to Victim's homicide. Upon arriving on the scene at approximately 8:20 a.m., he learned that Victim's car, a 2011 black Honda Accord, was smoldering when the NOFD arrived. To extinguish the fire, NOFD opened the trunk, hood and car doors; Victim's body was found in the trunk.

After securing the area and photographs of the car and body were taken, a search warrant was obtained for Victim's car and it was towed to police headquarters. At that point, crime lab technicians swabbed the car, looking for possible DNA evidence. However, none sufficient for testing was found and body samples taken for DNA testing all matched Victim.

A 9-millimeter firearm and shell casings were recovered from the vehicle's passenger area and trunk. Testing proved that the gun was the murder weapon. Det.

Barrere's investigation revealed that Victim was shot both while in the vehicle and after she was moved to the trunk.

Following interviews with Victim's friends, Det. Barrere learned that prior to her death, Victim was on her way to meet a friend named "Thayon," in an apartment in New Orleans East.

Det. Barrere reviewed Victim's cell phone records, testifying that Victim called 9-1-1 at 4:45 a.m. on June 21, 2015. The cell phone tower that registered the 9-1-1 call was the one closest to the residence of Thayon. Before calling 9-1-1, Victim placed two calls to Thayon. The last cell phone tower registering a call on Victim's phone was "near Old Gentilly, Chef area, and Michoud," the closest to where Victim's body was found.

After learning this information, Det. Barrere obtained Thayon's cell phone records, which confirmed the two phone calls with Victim. Det. Barrere contacted Thayon and requested that he come to police headquarters for an interview. At the interview, Thayon acknowledged seeing Victim at around 4:00 a.m. while he and Defendant were at a club, but denied any involvement in her death.

Thayon's cell phone records belied his denial. When Victim placed her 9-1-1 call, Thayon's cell phone pinged off a cell tower close to his apartment building where the attack occurred.[6] At 6:35 a.m., Thayon's cell phone pinged off a tower

---

[6] Cell phones are constantly sending out signals, or "pings," that are picked up by the nearest transmission tower. In the reverse direction, rescue and law enforcement authorities can determine the pinged cell phone user's actual physical location when they cross-compare the phone ping's distance from a number of different transmission towers. www.sophisticatededge.com/what-does-pinging-a-cell-phone-location-mean.html

close to the location of Victim's body. After the report of the burning car and the body was found, Thayon's phone pinged from a tower located in the direction where H.C. testified the old Jaguar was heading, the west bank.

Det. Barrere then obtained a warrant for Thayon's DNA. The DNA sample matched that found on a pair of red shorts located in Victim's vehicle. He then arrested Thayon for Victim's second-degree murder.

Based on Victim's 9-1-1 call, police knew that two men were involved in her attack and ultimate murder. One person investigated as the possible second perpetrator was Trevone Samson ("Trevone"), Thayon's brother. Trevone's cell phone records, however, reflected that one minute before Victim placed her 9-1-1 call, he was uptown around Audubon Street and Earhart Boulevard.

Defendant was then investigated as the second man since Thayon identified Defendant as being with him when he met Victim. Det. Barrere obtained Defendant's cell phone records; his cell phone was pinging off the cell tower nearest Thayon's apartment at 4:23 a.m., approximately twenty minutes before Victim's 9-1-1- call. Thereafter, Thayon's cell phone pinged off a particular tower at 6:19 a.m. and Defendant's phone pinged off a tower in the same area at 6:34 a.m. The proximity of the two cell phones continued. Thayon's cell phone pinged off a west bank tower at 7:38 a.m. and Defendant's cell phone pinged off a tower nearby at 7:49 a.m.[7]

---

[7] Det. Barrere explained that Thayon and Defendant had different cell phone providers so their phones were pinging off different towers but the towers were in the same vicinity.

Following Thayon's arrest, Det. Barrere obtained his cell phone. Data from the phone revealed a series of texts between Thayon and Defendant in the early morning hours of June 21, 2015, reflecting that the two were going to meet. At no time did Thayon mention meeting with Trevone.

Det. Barrere also testified about letters written by Thayon while in jail. In a letter to Defendant, Thayon complained that he was in custody because he "tr[ied] to flip a bitch with you." Thayon sought money from Defendant to pay for a lawyer. In letters to various family members and associates, Thayon admitted that he was "not totally innocent here ... but I wasn't the gunman. I wasn't the one who pulled the trigger on that girl." In another letter, Thayon stated that once he hired a lawyer, he needed Defendant "knocked off" and then Defendant could blamed for everything. He mentioned that Defendant had two vehicles, "the Jag and the white van," and once again complained that his life was "on the line all because I tried to flip the little bitch with him."

Based on the vehicle registration, Det. Barrere confirmed that Defendant was the registered owner of a 2002 X-Type Jaguar. No evidence existed that Thayon owned a Jaguar.

On cross-examination, Det. Barrere confirmed that, after receiving a cell phone call from Thayon at 4:44 a.m., Trevone drove towards New Orleans East. Thirteen minutes after that call, Trevone's cell phone pinged from a cell tower in New Orleans East, placing Trevone in the area at approximately 4:57 a.m., about the same time that Victim's 9-1-1 call ended.

The defense questioned Det. Barrere about Victim's 9-1-1 call, specifically, her statement that a man was pointing a gun at her and it was "a guy she met once before." Det. Barrere admitted that Victim had met Thayon once before but had not previously met Defendant. Det. Barrere stated that he could not confirm who was yelling at Victim. Det. Barrere testified: "I can't confirm it, I mean, I don't know. His name is never used and [Victim] never used a name, and it was just this angry yelling. It's hard to say who it is."

Defense counsel repeated H.C.'s testimony that a man with a Mohawk, who was on the television show "First 48," got into the passenger side of the Jaguar that fled the scene of the smoldering vehicle. Det. Barrere agreed that Thayon, not Defendant, was on "First 48" and that Thayon had a Mohawk.

Det. Barrere stated that Trevone's cell phone pinged off a cell tower near Thayon's apartment building shortly after Victim's 9-1-1 call ended but Thayon was no longer at the apartment complex. Instead, Det. Barrere testified that when Trevone arrived at the apartment complex, Thayon's cell phone was pinging off "a different tower around Martin Drive, which is further into [New Orleans] East from his apartment." Later, Trevone's cell phone pinged off a cell tower in the area where Victim's body was discovered. However, at around 6:10 a.m. and 6:30 a.m., Trevone's cell phone was "pinging back at Earhart and Audubon, uptown."

Det. Barrere testified about a letter from Thayon to Trevone dated July 31, 2015, approximately one month after the murder, wherein Thayon thanked his brother "for everything, including that night." In another letter from Thayon to

9

Trevone, Thayon directed his brother to destroy the letter; the defense suggested this constituted obstructing justice since the letter was evidence against Thayon. Det. Barrere acknowledged the letter's contents, but noted that Thayon never asked Defendant to destroy the letter or otherwise obstruct justice.

Det. Barrere stated that, while the evidence was obtained in 2015, the grand jury did not indict Defendant until 2017. With respect to Trevone's cell phone records, Det. Barrere stated that the call between the two brothers at 4:57 a.m. pinged off "a tower near Chef and Downman." Around this same time, Victim's cell phone was also pinging off a tower near the same location. At around 5:00 a.m., Thayon's cell phone pinged "off a different tower further from the apartment."

On re-direct examination, Det. Barrere reviewed the numerous cell phone calls between Thayon and Trevone. Seven calls were made between 4:44 a.m. and 5:36 a.m. Det. Barrere could not explain why the two brothers would be talking on their cell phones during these short, intermittent periods if they were together at the time. Further, Trevone's cell phone once again pinged off a cell tower in uptown New Orleans at 6:10 a.m.

Det. Barrere confirmed that Trevone's cell phone did not ping at Downman and Chef until 4:57 a.m. after Victim's 9-1-1 call ended. Finally, with respect to evidence obtained during his investigation, Det. Barrere testified that he was unable to interview H.C. until March 2016, who supplied his information anonymously through Crimestoppers in June 2015.

Sean McElrath testified that he was the NOPD Section Chief of the Forensic Firearms Unit and a firearms and tool-marks examiner. McElrath was accepted, without objection, as an expert in the field of firearm examination. Based on ballistics testing, McElrath concluded that all of the ammunition recovered was fired from the 9-millimeter firearm found at the scene. McElrath saw no evidence of more than one firearm.

**ASSIGNMENTS OF ERROR**

Defendant has assigned three counseled errors for review:

1. The evidence was insufficient to support defendant's convictions for second-degree murder, second-degree kidnapping, and obstruction of justice; the State failed to negate every reasonable hypothesis of innocence; and the State failed to prove an element of second-degree kidnapping.

2. It constitutes double jeopardy for defendant to be convicted of, and punished for, both second-degree murder under the felony-murder doctrine and the underlying offense of second-degree kidnapping.

3. Defendant's Sixth and Fourteenth Amendment rights were violated by the lack of a unanimous jury verdict for second-degree murder.

Defendant has assigned six pro se errors for review:

1. There was insufficient evidence to support defendant's convictions for second degree murder, second degree kidnapping, and obstruction of justice.

2. Defendant was denied due process when the State forced the trial judge to provide a constructive amendment of the indictment.

3. Defendant's constitutional rights were violated by virtue of the fact that the cell phone location data was presented to jurors by Detective Robert Barrere rather than an "expert witness."

11

4. Defendant's constitutional right to appeal was denied due to "missing transcripts."

5. Defendant's direct appeal should be stayed while the case of *Ramos v. Louisiana*, ___ U.S. ___, 139 S.Ct. 1318, 203 L.Ed.2d 563 (2019), is pending.

6. The trial court erred in refusing to instruct the jury to the effect that "mere presence" at the scene of a crime is insufficient to support a finding of guilt.

**ERRORS PATENT**

A review of the record reveals no errors patent.

**DISCUSSION**

*Counseled Assignment of Error Number One*
*Pro Se Assignment of Error Number One*

In these first assignments of error, Defendant contends the evidence was insufficient to support his convictions-the evidence presented at trial was circumstantial and failed to exclude every reasonable hypothesis of innocence. In his pro se brief, Defendant further argues that the evidence was insufficient to establish that more than one person attacked and ultimately murdered Victim. In support, Defendant points to Victim's references in her 9-1-1 call that "he" was doing various things to her, rather than "they," and that one voice is heard yelling at Victim in the background. Defendant notes the expert testimony that only one gun was used to murder Victim and certain text messages showed that Defendant was not with Thayon during the entire period at issue.

The standard for review of a claim of insufficiency of the evidence was laid out by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979):

> …the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a

reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a Defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. [Emphasis in original; citation omitted].

"Under the *Jackson* standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court." *State v. Williams*, 11-0414, p. 18 (La.App. 4 Cir. 2/29/12), 85 So.3d 759, 771. Further, "a factfinder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence." *Id*. But where no direct evidence is presented proving one or more of the elements of the offense, La. R.S. 15:438 governs circumstantial evidence and states "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." "Stated differently, the reviewer as a matter of law, can affirm the conviction only if the reasonable hypothesis is the one favorable to the state and there is no extant reasonable hypothesis of innocence." *State v. Green*, 449 So.2d 141, 144 (La.App. 4th Cir. 1984) (citing *State v. Shapiro*, 431 So.2d 372 (La. 1983)); *State v. Ramos,* 16-1199, p. 9 (La.App. 4 Cir. 11/2/17), 231 So.3d 44, 50 (subsequent history omitted). "This test is not separate from the *Jackson* standard; rather it simply requires that 'all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that Defendant is guilty beyond a reasonable doubt.'" *Ramos*, 16-1199, p. 9, 231 So.3d at 50 (quoting *State v. Ortiz*, 96-1609, p. 12 (La. 10/21/97), 701 So.2d 922, 930). If a rational trier of fact reasonably rejects a defendant's hypothesis of innocence, that hypothesis falls and, unless another one creates reasonable doubt, a defendant is guilty. *State v. Howard,*

13

15-1404, p. 5 (La. 5/3/17), 226 So.3d 419, 423 (citing *State v. Captville,* 448 So.2d 676, 680 (La. 1984)).

"A reasonable alternative hypothesis is not one 'which could explain the events in an exculpatory fashion,' but one that 'is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt'" *State v. Mack*, 13-1311, p. 9 (La. 5/7/14), 144 So. 3d 983, 989 (quoting *Captville*, 448 So. 2d at 680). Therefore, "where the evidence is purely circumstantial, if it does not exclude every reasonable hypothesis of innocence, a rational juror cannot find Defendant guilty beyond a reasonable doubt without violating constitutional due process safeguards." *State v. Raine,* 17-0330, p. 8 (La.App. 4 Cir. 3/7/18), 238 So.3d 1076, 1082 (quoting *State v. Monds*, 91-0589 (La.App. 4 Cir.1/14/94), 631 So. 2d 536, 539).

Defendant was convicted of second-degree murder, second-degree kidnapping and obstruction of justice. With respect to second-degree murder, jurors were instructed with respect to two components of the statute. First, they could find Defendant guilty of second-degree murder if they found that Defendant had the specific intent to kill or inflict great bodily harm. Specific criminal intent is that state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or his failure to act. La. R.S. 14:10. Under La. R.S. 14:24, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."

Second, Defendant could also be found guilty of second-degree murder if jurors found the killing occurred while Defendant was engaged in the commission

or attempted commission, perpetration or attempted perpetration of the crime of second-degree kidnapping, even though he had no intent to kill or inflict great bodily harm.

With regard to the charge of second-degree kidnapping, instructions to the jury were that it must find that Defendant forcibly seized Victim and carried her from one place to another and Victim was physically injured.

Finally, Defendant was charged with obstruction of justice in connection with the second-degree murder and/or second-degree kidnapping of Victim. Jurors were instructed that to convict Defendant of obstruction of justice, they must find that: (1) Defendant knew or had good reason to believe that his act may affect a criminal proceeding; (2) Defendant tampered with evidence during the commission of second-degree murder and/or second-degree kidnapping; (3) Defendant had a specific intent to distort the results of a criminal proceeding: and (4) the evidence was reasonably likely to be relevant in the proceeding.

With respect to the conviction on the charge of second-degree murder, Defendant argues: "[a]ll of the evidence in the case points to Thayon as the person who killed [Victim]." Defendant notes that Victim called Thayon on her way to his apartment and Thayon's gym shorts were found in Victim's vehicle with her blood on them. Further, Defendant claims that it was Thayon to whom Victim was talking about in her 9-1-1 call, since she told the operator, that the person "hurling" bad language at her, was a person she met once, that being Thayon but not Defendant. Finally, Defendant claims that "Thayon Samson is the person heard shouting at [Victim] during the 9-1-1 call."

However, based on the evidence presented to the jury, Defendant was with Thayon during the early morning hours of June 21, 2015.  In his initial police

15

interview, Thayon stated that Defendant was there when he met Victim. In fact, cell phone records show that Defendant was with Thayon shortly before Victim placed her 9-1-1 call at Thayon's apartment complex. Defendant's cell phone was pinging off a cell tower near Thayon's apartment at 4:23 a.m., approximately twenty minutes before Victim's 9-1-1 call. Thereafter, the cell phone records reflected that Thayon and Defendant stayed together, with their phones pinging off cell towers in the same area at approximately 6:30 a.m. and 7:45 a.m. Further, Sgt. Merricks testified that during Victim's 9-1-1 call, a listener could hear two men having a conversation and Victim clearly threatened to "blow both of ya'll away." When asked by defense counsel to state that only Thayon is heard on the 9-1-1 call, Det. Barrere stated that, while two men were on the scene, he could not confirm which one was yelling at Victim.

The State proved that two men were together when Victim was attacked. Sgt. Merricks testified that two men were having a conversation in the background on the 9-1-1 call. A series of texts between Thayon and Defendant during the early morning hours of June 21, 2015, indicated that the two planned to meet. Defendant's and Thayon's cell phones were pinging off towers in the same areas at the same times and in close proximity with Victim's locations.

In addition to the 9-1-1 recording and cell phone records, Thayon's letters implicated Defendant and demonstrated that they were together when the events occurred. While Defendant describes Thayon's letters as "self-serving," the weight accorded to the letters was a matter for the jury to decide notwithstanding the apparent hearsay nature of the evidence.[8]

---

[8] Defendant did not object to the admission of the letters.

Based on the guilty verdict, eleven of the twelve jurors decided either that Defendant had the specific intent to kill Victim or the killing occurred while Defendant was engaged in the perpetration of the crime of second-degree kidnapping even without intent to kill or inflict great bodily harm.

With respect to second-degree kidnapping, jurors were instructed that they must find that Defendant forcibly seized Victim and carried her from one place to another and that Victim was physically injured. According to Defendant, the evidence did not support such a finding because Victim "was already dead before she was transported in the trunk of her car to the scene where the vehicle was set on fire." In support of this claim, Defendant points to the testimony of the pathologist, Dr. Gardner, who testified that Victim was dead before she was burned. However, Dr. Gardner's testimony merely shows that Victim was dead when her vehicle was set on fire. It provides no insight into whether Victim was dead when she was transported from the area where the attack occurred to where the vehicle was abandoned. Further, as Det. Barrere testified, Victim was shot both while she was in her vehicle and after she was placed in the trunk. The jury could logically conclude that Victim was alive when she was moved from inside her vehicle and placed in the trunk whereupon several more rounds were fired into her body.

The evidence supports a finding that Defendant was with Thayon from the time of the 9-1-1 call and until Victim's vehicle was abandoned. While no eyewitness testimony reflects the transport of Victim from car to trunk and from where the attack occurred to where the vehicle was burned, jurors, based on their unanimous verdict that found Defendant guilty of second-degree kidnapping, found that Defendant, at a minimum, aided with the transport. No testimony was

17

offered as to who actually set Victim's vehicle on fire. However, the jurors could rationally conclude that Defendant obstructed justice based on evidence that Defendant's and Thayon's cell phones were pinging off nearby cell towers around the time the vehicle was abandoned.

The jury also rejected Defendant's claim that, while he may have been with Thayon during the 9-1-1 call and the events leading to Victim's death, he did not participate in these horrific acts. Further, jurors rejected the hypothesis that it was Trevone, rather than Defendant, who assisted Thayon in attacking Victim, moving her and setting her vehicle on fire. The jury's rejection of these hypothetical theories of innocence is well founded based on the evidence presented at trial.

Viewing the circumstantial evidence in a light most favorable to the prosecution, a rational juror could find that Defendant participated in the acts leading to Victim's death and the mutilation of her body. Defendant's proposed hypothesis that he was merely an innocent bystander strains credulity. Defendant would have one believe that he merely stood back, let Thayon do whatever he wanted to do to Victim, and then drove Thayon away from the scene. Jurors reasonably rejected Defendant's claim in this regard. The evidence was sufficient to support Defendant's convictions.

Next, Defendant complains that Thayon's jailhouse letters do not implicate him as the killer and that the letters "are completely hearsay." Defendant is correct. Thayon's letters do not implicate Defendant as the one who shot and killed Victim. Thayon stated that he himself was not the shooter. As far as Defendant's complaint that the letters were hearsay evidence, "the weight to be accorded to the letters was a matter for the jury to decide notwithstanding the apparent hearsay nature of the

18

evidence." Further, Defendant lodged no objection to the admission of Thayon's letters.

Defendant also asserts that the evidence was insufficient to establish that he was present when Victim was transported from the place of the attack to where her vehicle was dumped and burned. Defendant states that witness H.C. did not identify him. Further, Defendant complains that the State failed to prove that the Jaguar seen driving away from the crime scene belonged to him.

H.C. testified that he clearly saw an older model Jaguar drive away from where Victim's vehicle was set on fire. Det. Barrere confirmed Defendant was the registered owner of a 2002 X-Type Jaguar. Further, while H.C. could not identify Defendant as the driver of the getaway car, he clearly identified Thayon as its passenger and cell phone records demonstrated that Defendant and Thayon were together on the west bank, the direction in which H.C. testified the Jaguar was heading shortly after Victim's vehicle was abandoned and burned.

Defendant further contends four phone calls not presented at trial would have shown that he and Thayon were not together. However, as an appellate court, we are restricted to an examination of the evidence presented at trial.[9]

Finally, Defendant argues that a reasonable alternative theory to the murder exists, namely, that Trevone was with Thayon when Victim was killed and her body burned. This hypothesis was presented to and rejected by jurors based on the overwhelming phone data showing that Trevone and Thayon were not together that night. As Det. Barrere testified, when Victim's 9-1-1 call was made, Trevone's cell

---

[9] The fact that evidence, allegedly exculpatory, was not presented at trial, is not a matter considered on direct appeal. *See State v. Johnson*, 09-0259, p. 10 (La.App. 4 Cir. 9/16/09), 22 So.3d 205, 212 ("an appellate court may not consider evidence which is outside the record").

phone records indicate that he was in uptown New Orleans. Further, during the time-period at issue, Trevone and Thayon were continually placing calls to each other, clearly showing that they were not together.

Based on the above-described evidence, viewed in a light most favorable to the prosecution, a rational trier of fact could have found Defendant guilty on the charges of second-degree murder, second-degree kidnapping, and obstruction of justice. These assignments of error are without merit.

*Counseled Assignment of Error Number Two*

Defendant contends that double jeopardy prohibits a conviction of both second-degree murder under the felony-murder doctrine and the underlying offense of second-degree kidnapping. Defendant is correct: if the second-degree murder conviction was based solely upon participation in the second-degree kidnapping, he cannot be convicted of the underlying offense. *See Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977) (*per curiam*); *State v. Frank,* 16-1160, pp. 9-10  (La. 10/18/17), 234 So.3d 27, 33. However, jurors were instructed with respect to alternate theories of second-degree murder. First, they could find Defendant guilty of second-degree murder if they found Defendant had the specific intent to kill or inflict great bodily harm. Second, they could find Defendant guilty of second-degree murder if the killing occurred while Defendant was engaged in the commission or attempted commission, perpetration or attempted perpetration, of the crime of second-degree kidnapping even without specific intent to kill or inflict great bodily harm.

It is unknown what definition of second-degree murder the jury utilized to support its finding of guilt. However, in these situation, where alternate theories of an offense are provided, a defendant's convictions for second-degree murder and

the underlying offense, "can be upheld on appeal if there is sufficient evidence to support second-degree murder as a specific intent crime." *State v. Brown,* 96-1002, p. 4 (La.App. 5 Cir. 4/9/97), 694 So.2d 435, 437; *State v. Thomas,* 50,929, p. 28 (La.App. 2 Cir. 8/10/16), 201 So.3d 263, 279.

Specific intent is the state of mind that exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act. La. R.S. 14:10(1); *State v. Davis,* 40,382, p. 4 (La.App. 2 Cir. 10/26/05), 914 So.2d 1129, 1133. Specific intent need not be proved as a fact; it may be inferred from the circumstances and a defendant's actions. *State v. Caliste*, 12-0533, p.9 (La.App. 4 Cir. 9/4/13), 125 So.3d 8, 14. The discharge of a firearm at close range is indicative of a specific intent to kill or inflict great bodily harm upon that person. *State v. Murray,* 36,137, p. 13 (La. App. 2 Cir. 8/29/02), 827 So.2d 488, 496; *State v. Brooks,* 49,024, p. 5 (La.App. 2 Cir. 5/14/14), 139 So.3d 1072, 1076. The determination of whether the requisite intent is present is an issue resolved by the trier of fact. *State in Interest of S.J.,* 13-1025, p. 5 (La.App. 4 Cir. 11/6/13), 129 So.3d 676, 679; *State v. Huizar,* 414 So.2d 741, 751 (La. 1982).

A defendant's mere presence at a scene is not enough to "concern" an individual in the crime. *State v. Hampton*, 98-0331 (La. 4/23/99), 750 So.2d 867; *State v. Spencer,* 14-0003, p. 10 (La.App. 4 Cir. 10/8/14), 151 So.3d 816, 823. Acting in concert, each person becomes responsible not only for his own acts, but also for the acts of the other. *State v. Anderson,* 97-1301 (La. 2/6/98), 707 So.2d 1223. In order to be convicted as a principal, the State must show that a defendant has the requisite mental intent to commit the crime. *State v. Newman,* 03-1721, p. 13 (La.App. 4 Cir. 7/7/04), 879 So.2d 870, 878; *State v. Harry,* 01-2336, p. 7

21

(La.App. 4 Cir. 6/26/02), 823 So.2d 987, 993. Although factors that can contribute to the finding that a defendant is a principal include "'standing by at the scene of the crime ready to give some aid if needed ... it is necessary that the principal actually be aware of the accomplice's intention.'" *State v. Anderson,* 97-1301, p. 3 (La. 2/6/98), 707 So.2d 1223, 1225 (quoting 2 W. LaFave, A. Spencer, *Substantive Criminal Law,* §6.7, p. 138 (West 1996)); *see also State v. Pleasant,* 11-1675 (La.App. 4 Cir. 10/17/12), 102 So.3d 247. Under the law of principals, a defendant may be convicted of an offense even if he did not personally fire the fatal shot. *State v. Curtis,* 11-1676, pp. 15-16 (La.App. 4 Cir. 3/13/13), 112 So.3d 323, 333.

In this case, the jurors did not accept Defendant's theory that he was merely an innocent bystander during the horrific events that led to Victim's death. In her 9-1-1 call, Victim referred to two assailants, threatening to "blow **both of ya'll away** [emphasis added]." Threats were made against Victim and, as Det. Barrere noted, it was impossible to discern which of the two assailants was yelling in the background of the 9-1-1 call. The extensive mutilation of Victim's body indicates that more than one assailant took part in the brutal actions which led to her death. Victim suffered nine gunshot wounds. Evidence of strangulation and "multiple evidence of blunt force injury" were also present. This level of mutilation clearly indicates a specific intent to kill or inflict great bodily harm. Just as jurors could infer that Defendant participated in these actions, they could also conclude that Defendant had the specific intent to kill Victim or inflict great bodily harm. Because the evidence was sufficient to support second-degree murder as a specific intent crime, Defendant suffered no violation of his protection against double jeopardy by virtue of his conviction on the charge of second-degree kidnapping. The instant claim is without merit.

*Counseled Assignment of Error Number Three*
*Pro Se Assignment of Error Number Five*

In these assignments of error, Defendant asserts that his constitutional rights were violated by a non-unanimous (eleven to one) verdict on the charge of second-degree murder. Defendant seeks to preserve his claim, noting that the United States Supreme Court granted certiorari in *State v. Ramos*, 16-1199 (La.App. 4 Cir. 11/2/17) 231 So.3d 44 and the issue of whether the U.S. Constitution requires unanimous jury verdicts is currently pending.

Nevertheless, in the interim, La. Const. Art. I §17 states pertinently:

> A criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. **A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict.** A case for an offense committed on or after January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. [Emphasis added.]

"Louisiana follows the general rule that a constitutional provision or amendment has prospective effect only, unless a contrary intention is clearly expressed." *State v. Johnson*, 18-0409, p. 25 (La. App. 4 Cir. 3/13/19), 266 So.3d 969, 985 (citing *State v. Cousan,* 96-2503, p. 17 (La. 11/25/96), 684 So.2d 382, 392-93.) La. Const. Art. I, §17 and La. C.Cr.P. art. 782, as amended, explicitly state that the amendment applies only to offenses that occur on or after January 1, 2019.

Defendant committed the offenses in June 2015, well before the date the legislature provided for prospective application of La. C.Cr.P. art. 782 and Const.

Art. I §17. Accordingly, he is not entitled to have his non-unanimous conviction reversed pursuant to the 2018 amendments.[10]

Therefore, Defendant has not suffered a violation of his constitutional rights by virtue of the jury's finding of guilt on the charge of second-degree murder by a vote of eleven to one. These assignments of error are without merit.

*Pro Se Assignment of Error Number Two*

Defendant states that, while the indictment charged him with second-degree murder that entails a specific intent to kill or inflict great bodily harm, the jury instructions permitted a conviction under the felony-murder doctrine. By allowing these alternate theories of guilt, the district court constructively amended the indictment and, therefore, his second-degree murder conviction must be reversed.

Defendant lodged no objection to the district court's instruction to jurors regarding alternate theories of guilt. The district court asked on two occasions whether the parties had any objections to the jury charges; both times defense counsel responded in the negative. A defendant's failure to object to the district court's jury instructions precludes him from challenging the instructions on appeal. *State v. Sandifer,* 16-0842, p. 5 (La.App. 4 Cir. 6/27/18), 249 So.3d 142, 149 (citing La. C.Cr.P. art. 841(A) (providing that "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence")); *State v Lincoln,* 17-0170, pp. 37-38 (La.App. 4 Cir. 11/03/17), 231 So.3d 161, 182

---

[10] In *State v. Bertrand*, 08-2215 pp. 4-8 (La. 3/17/09), 6 So.3d 738, 741-43, the Louisiana Supreme Court again confirmed that, under current U.S. Supreme Court jurisprudence, non-unanimous twelve-person jury verdicts do not violate a Defendant's constitutional rights under the Sixth and Fourteenth Amendments, and that La. C.Cr.P. art 782 "withstands constitutional scrutiny." *See also State v. Lewis*, 16-0224 p. 21 (La.App. 4 Cir. 12/29/16), 209 So.3d 202, 215 (finding *Bertrand* dispositive on this issue).

24

(observing that "[t]his Court has also found that the failure to object to jury instructions precludes a Defendant from raising the issue on appeal")).

Even assuming Defendant had lodged a timely objection, any error the district court may have committed in providing jurors with alternate theories of guilt was harmless as the evidence was sufficient to support a finding that Defendant had the specific intent to kill Victim or inflict great bodily harm.

The jurors clearly did not accept Defendant's theory that he was merely an innocent bystander during the horrific events that led to Victim's death. In her 9-1-1 call, Victim referred to two assailants. Just as the jurors could infer that Defendant participated in these actions, they could infer that Defendant had the specific intent to kill Victim or inflict great bodily harm.

Because the evidence was sufficient to support second-degree murder as a specific intent crime, any error the district court may have committed in providing jurors with alternate theories of guilt was harmless. Defendant suffered no violation of his constitutional rights.

*Pro Se Assignment of Error Number Three*

Defendant claims that the district court erred in allowing Det. Barrere to testify with respect to the cell phone data, specifically, testifying as to which cell phone was pinging off which tower at a specific time. Defendant contends that the State should have had an expert introduce this evidence.

The transcript reflects that defense counsel objected to Det. Barrere's cell phone data testimony, arguing that he offered "expert testimony that can only be provided by an expert in historical cell data…." The district court overruled the objection, reasoning: "I do not believe that Det. Barrere's testimony is as [an] expert on this issue."

The district court did not err. Lay witnesses routinely provide cell phone data testimony. *See State v. Jackson*, 15-0809, p. 22 (La.App. 4 Cir. 5/25/16), 193 So.3d 425, 438-39 (district court did not err in allowing detective to testify about calls made and received and tower locations for calls; qualification as an expert not required when witness readily admitted that "information supplied by the cell service provider was used during his investigation"); *State v. Morgan*, 12-2060, pp. 13-15 (La.App. 1 Cir. 6/7/13), 119 So.3d 817, 826-827 (as lay witness, detective can tell jurors what cell towers accepted the cell phone signals at specific times based upon the witness's examination of the cell phone records).

The cell phone records were properly admitted into evidence. They reflect the location of the cell towers on which Defendant's, Thayon's, and Trevone's cell phones pinged, along with the times that occurred. A layperson's review of the records would reflect the same data as an analysis by an expert. This assignment of error is without merit.

*Pro Se Assignment of Error Number Four*

Defendant claims his constitutional right to appeal was denied because some transcripts are missing from the appellate record. La. Const. Art. I, §19 of the guarantees defendants a right of appeal "based upon a complete record of all the evidence upon which the judgment is based." *State v. Frank*, 99-0553, p. 20 (La. 1/17/01), 803 So.2d 1, 19. However, a defendant is not entitled to relief because of an incomplete record absent a showing of prejudice based on the missing portions of the transcripts. *State v. Alridge,* 17-0231, p. 47 (La. App. 4 Cir. 5/23/18), 249 So.3d 260, 292, *writ denied*, 18-1046 (La. 1/8/19), 259 So.3d 1021; *State v. Castleberry,* 98-1388, p. 29 (La. 4/13/99), 758 So.2d 749, 773. Many of the

26

transcripts that Defendant claims are missing are contained in the record.[11] To the extent some are missing, Defendant has made no showing of prejudice as a result. Instead, Defendant broadly proclaimed that "violations of major magnitude" exist. Such a proclamation is insufficient to satisfy the prejudice requirement. Transcripts are not produced for allowing litigants to engage in fishing expeditions. *See State v. Beckley,* 18-0386, p. 16 (La.App 5 Cir. 5/8/19), 273 So.3d 503, 514 (generic claim that lack of various transcripts makes proper review of defendant's appeal impossible, amounts to a "fishing expedition," and insufficient to support supplementation of the record); *State v. Sharp*, 35,714, p. 24 (La.App. 2 Cir. 2/27/02), 810 So.2d 1179, 1194 (defendant not entitled to supplement the record on appeal absent showing that requested transcript was related to specific assigned errors). Thus, this assignment of error is without merit.

*Pro Se Assignment of Error Number Six*

Finally, Defendant asserts that he had the right to have the jury instructed on one of his theories of defense: that his "mere presence" at the scene was insufficient to support a finding of guilt.

As noted earlier, Defendant failed to object to the district court's jury instructions and, thus, may not complain about the instructions on appeal. *See Sandifer,* 16-0842, p. 5, 249 So.3d at 149 (law is clear that a defendant's failure to object to the district court's jury instructions precludes him from challenging the instructions on appeal). In any event, the district court provided jurors with a definition of "principals," which made clear that a person's mere presence at a crime scene was insufficient to support a guilty verdict. The court instructed that

---

[11] For instance, Defendant lists the voir dire transcript, the jury instruction transcript and the closing argument transcript as missing. However, all of these matters were transcribed and contained in the record.

to be a principal and guilty of the crime charged, one must, "whether present or absent," "directly commit the act constituting the crime, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime." Thus, this final assignment of error has no merit.

**CONCLUSION**

Based on the foregoing and finding no merit to any of Defendant's assignments of error, both counseled and pro se, we affirm Defendant's convictions.

**AFFIRMED.**