| STATE OF LOUISIANA | * | NO. 2021-KA-0061 |
|---|---|---|
| VERSUS | * | |
| | | COURT OF APPEAL |
| DWIGHT WASHINGTON | * | |
| | | FOURTH CIRCUIT |
| | * | |
| | | STATE OF LOUISIANA |

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 542-128, SECTION "H"
Honorable Camille Buras, Judge
* * * * * *
* * * * * *
**JAMES F. MCKAY III**
**CHIEF JUDGE**

(Court composed of Chief Judge James F. McKay III, Judge Terri F. Love, Judge Edwin A. Lombard)

JASON R. WILLIAMS
DISTRICT ATTORNEY, ORLEANS PARISH
G. BEN COHEN
CHIEF OF APPEALS
ADELE M. KRIEGER
ASSISANT DISTRICT ATTORNEY
619 S. White Street
New Orleans, Louisiana 70119
    COUNSEL FOR STATE/APPELLEE

SHERRY WATTERS
LOUISIANA APPELLATE PROJECT
P. O. Box 58769
New Orleans, Louisiana 70158
    COUNSEL FOR DEFENDANT/APPELLANT

**CONVICTIONS AND SENTENCES VACATED AND REMANDED**

**AUGUST 4, 2021**

**STATEMENT OF CASE**

On July 19, 2018, an Orleans Parish Grand Jury returned an indictment charging the defendant, Dwight Washington, as follows: count one-second degree murder of Darrell Pollard; count two-second degree murder of Terran Young; count three-attempt to commit second degree murder of Jahon White; count four-attempt to commit second degree murder of Bruce Pollard; count five-obstruction of justice in connection with the second degree murder investigation. On July 25, 2018, the defendant was arraigned and entered pleas of not guilty.

Trial commenced on February 10, 2020, with *voir dire* proceedings and continued through to February 13, 2020. On February 13, 2020, the jury rendered its verdicts, finding the defendant guilty as charged on all counts. Thereafter, the polling slips were reviewed and the court confirmed that the guilty verdicts were rendered by virtue of eleven guilty votes and one not guilty vote.

On March 5, 2020, the date the defendant was set to be sentenced, the defendant filed a motion for a new trial, arguing, *inter alia,* that he was entitled to a new trial by virtue of the non-unanimous verdicts. On that same date, the court

1

denied defendant's motion. Thereafter, the court proceeded to sentence defendant

as follows:

> In count 1 for the second degree murder of Darrell Pollard … the [c]ourt imposes the mandatory penalty that you must serve the remainder of your natural life in the Department of Corrections, that sentence being without benefit of probation, parole, or suspension of sentence. On count 2, for the indicted charge of second degree murder of Terran Young … the [c]ourt imposes the mandatory sentence, sentencing you to serve the remainder of your natural life in the Department of Corrections without benefit of probation, parole, or suspension of sentence. On count 3 for the indicted charge of attempted second degree murder of Johan White … the [c]ourt sentences you to the maximum of 50 years in the Department of Corrections. That sentence is without benefit of probation, parole, or suspension of sentence. On count 4 for the indicted charge of attempted second degree murder of Bruce Pollard … 50 years, Department of Corrections. That sentence is without benefit of probation, parole, or suspension of sentence…. On count 5, [the obstruction of justice,] the [c]ourt sentences you to 40 years, Department of Corrections. That sentence is at hard labor. Counts 1, 2, 3, 4 and 5, are to run concurrent with each other [with] credit for all time served from date of arrest.

Following sentencing, the defendant noted his objection to said sentences.

Additionally, the defendant filed a motion for appeal and designation of the record

on March 5, 2020, which the court granted.

**STATEMENT OF FACT**

Sergeant Mark McCourt ("McCourt") stated that he was employed by the

New Orleans Police Department as custodian of records for 911 calls. McCourt

testified with regard to numerous 911 calls received on June 15, 2017,

commencing at 11:11 p.m. The calls were played for the jury and McCourt

confirmed that one of the callers described a body being found at the scene of the

shooting. On cross-examination, McCourt informed that none of the 911 callers

identified the defendant as the shooter and none speculated that the shooting could

have been attributable to a "rap war."

2

Shavine Young, the mother of one of the murder victims, testified that she was asleep at home when notified that her nineteen-year-old son, Terran Young, had been killed. She stated that Terran was the second of her six children and that she had done her best to help her other children cope with the ordeal associated with Terran's murder. Shelia Dorsey testified that she had raised Darrell Pollard, the other murder victim of the June 15, 2017 shooting, since he was two weeks old.

Detective David DeSalvo ("DeSalvo") testified that on June 15, 2017, he was employed in the "Gang Unit" of the New Orleans Police Department. On that date, he was called at approximately 11:00 p.m. to investigate a shooting at the intersection of Carrollton Avenue and Earhart Boulevard. DeSalvo stated that he was one of the first officers to arrive at the scene and he witnessed a body lying on Carrollton Avenue. Approximately fifteen minutes after he had been on the scene, another incident was reported, a vehicle, found near University Hospital, was riddled with bullet holes and a body was inside the vehicle.

On cross-examination, DeSalvo stated that the victim found on Carrollton Avenue was not responsive and could not identify who shot him. At the scene where the bullet-riddled vehicle was recovered, the victim inside the vehicle was dead and, as such, could not identify who had shot him.

Detective Theophilus Kent ("Kent") testified that on June 15, 2017, he was employed in the New Orleans Police Department's Homicide Division. On that date, he reported to the area where the bullet-riddled car was located and found an unresponsive male lying in the back seat. Kent testified that as a result of his investigation he began to suspect that the shooting was associated with an ongoing feud between two gangs, the "Ghost Gang" and the "Byrd Gang." Further, pursuant to his investigation, it was discovered that a second vehicle was involved;

3

a "totally burned out vehicle" was discovered. It was Kent's belief that this second vehicle was used by the assailants and that it was intentionally set on fire. Kent testified that both victims, Terran Young and Darrell Pollard, were members of the Byrd Gang.

Bruce Pollard ("Bruce") testified that he did not want to be in the courtroom to offer testimony; admitting that he was currently serving a fifteen-year sentence. Bruce admitted that one of the victims, Darrell Pollard ("Darrell"), was his cousin and that he "grew up" with the other murder victim, Terran Young. Bruce also grew up with Johan White, another shooting victim who was not murdered. Bruce stated that before his incarceration he was a "rapper." Bruce admitted that he wrote a song, "Untouchable," with a gentleman named "Tokey Hefner." Bruce also sang a song entitled, "Cuttin Up." Bruce concluded his testimony by stating that he did not see who "shot up" the car in which he was traveling on June 15, 2017.

Detective Leonard Bendy ("Bendy") testified that he was employed in the Homicide Division of the New Orleans Police Department and was the lead investigator with respect to the double homicide of Darrell Pollard and Terran Young. Even prior to the June 15, 2017 shooting incident, Bendy was involved in the investigations of a series of homicides associated with an "ongoing gang war" between the Ghost Gang and the Byrd Gang. One such homicide, the death of a Ghost Gang member, occurred on January 31, 2017. The date of this particular homicide was tattooed on the right-side of defendant's face.

Bendy recalled receiving a call at approximately 11:20 p.m. regarding the homicide, which occurred at Carrollton Avenue and Earhart Boulevard. Bendy went to the crime scene where he found numerous shell casings, "[a] 9-millimeter

and … one .40-caliber." A firearm was also found at the scene, a "Glock 27 pistol."

There were no eyewitnesses to the shooting; however, Bendy was advised that there was a "secondary scene," believed to be associated with the Carrollton/Earhart shooting, located at the 200 block of North Johnson Street, near the University Medical Center. A black Honda Civic was located in the 200 block of North Johnson Street and Darrell Pollard, who was deceased, was located in the rear of the vehicle with multiple gunshot wounds. Also discovered in the vehicle was a ".40-caliber spent cartridge casing."

Bendy testified that police were able to identify the two murder victims relatively quickly. A third shooting victim, Johan White, was located in University Hospital, suffering from bullet wounds to his hand. The fourth victim, Bruce Pollard, was not in the hospital.

A video surveillance camera reflected what happened at the intersection of Carrollton Avenue and Earhart Boulevard. The video showed a gold Honda Accord pull alongside the black Honda Civic and commenced firing numerous bullets into the Civic. Thereafter, the video showed Terran Young falling out of the Civic after being struck by gunfire.

With the assistance of video surveillance cameras, Bendy was able to track the gold Accord after the shooting, tracking it as it traveled on Earhart Boulevard in a downtown direction. Once the vehicle stopped near the Calliope housing development, a camera showed an individual, "matching the physical description of [defendant]," exit the driver's seat of the vehicle with an assault rifle. The individual fitting the defendant's description was wearing a sleeveless white undershirt, jeans and what appeared to be Timberland boots. On his head was

5

what appeared to be "a type of headdress." The license plate on the vehicle was XQL828.

Though an individual fitting the defendant's description was depicted on a video surveillance camera exiting the gold Accord with an assault rifle, the defendant was not arrested at that point. Instead, Bendy obtained search warrants for social media of certain individuals. Bendy explained that sometimes information related to shooting events are placed in songs. During the investigation, Bendy focused on a song, "Untouchable," by Bruce Pollard. In the song, Bendy heard multiple references to June 15, 2017, the night of the shootings. Bruce rapped about the ongoing feud between the Ghost Gang and the Byrd Gang. Further, Bruce made reference to the fact that "Terran fell out of the car" and that he would have "gone back" had he known Terran Young had fallen out of the vehicle. At that point, Bendy attempted to question Bruce but Bruce declined to speak with him. However, pursuant to his investigation, Bendy ascertained that Bruce was the driver of the black Civic.

Bendy also listened to a rap song by "GB White" who he later learned was the defendant. In the song, the defendant made a reference to Bruce. The defendant also rapped about "letting sticks fly" which Bendy explained was "a reference to assault rifles and shooting."

Bendy listened to a second song, "Cuttin Up," by Bruce. In the song, Bruce made a direct threat to the defendant, threatening an assault rifle shooting of the defendant. Further, the song made reference to the shooting of Terran Young.

A review of the defendant's Twitter account reflected that the defendant responded to Bruce's "Cuttin Up" song. The defendant threatened Bruce.

As part of his investigation, Bendy discovered the defendant's cell phone numbers, 504-344-8917 and 504-577-3475, and applied for a search warrant to attain the defendant's cell phone records. Bendy explained that specifically what he sought to ascertain from the records was the area where the cell phones were located on a certain date and specific time. The records showed that at 11:13 p.m., the defendant's cell phone was "hitting off" a cell phone tower at 1401 South Broad Street, in close proximity to the Calliope housing development, an area associated with the Ghost Gang and the area where the gold Accord was parked following the shootings.

Thereafter, a series of photographs of the defendant pictured with other members of the Ghost Gang were introduced into evidence. The photographs reflected the defendant wearing clothing similar to the clothing depicted in the surveillance camera footage of the individual exiting the gold Accord on the night of the murders. There were pictures depicting the defendant holding an assault rifle similar to the one the individual exiting the gold Accord on the night of the murders was holding. A video was played for jurors which depicted the defendant holding up a rifle which was similar to the rifle being held by the individual exiting the gold Accord on the night of the murders. A second video was introduced which showed the defendant "talking about killing people with assault rifles."

Bendy testified that on June 17, 2017, a "burned out" vehicle was discovered in New Orleans East. The vehicle was a gold Accord with a license plate number of XQL828. Eleven "assault rifle-type casings" were recovered from the vehicle.

On cross-examination, Bendy testified that on the surveillance video reflecting an individual exiting the gold Accord, one "cannot see his face but you do see a subject matching [defendant's] physical build and description." Further,

7

Bendy admitted that in the photographs submitted reflecting the defendant wearing attire similar to the attire of the individual exiting the gold Accord on the night of the murders, sometimes the defendant is seen wearing tennis shoes rather than boots.

Sergeant Joseph Rees ("Rees") testified that he was a "night shift supervisor" with the Plaquemines Parish Sheriff's Office. He stated that in January 2019, he, along with a fellow officer, came into contact with Jaquan Cooper ("Cooper"). Upon looking inside Cooper's vehicle, Rees saw a weapon, an "AR pistol, sitting on the driver's floorboard." Cooper was subsequently arrested in connection with outstanding warrants and was charged with being a felon in possession of a firearm.

Kenneth Leary ("Leary") testified that he was employed by the "New Orleans Police Department's Crime Laboratory as a Criminalist III assigned to the Firearms Examination Unit." After testifying with regard to his credentials, Leary was accepted, without objection, as an expert in the field of firearms identification and analysis. Leary opined that his examination of eight of the nine-millimeter cartridge cases recovered from the 3000 block of Carrollton Avenue showed that they were fired from the same weapon.

Sean McElrath ("McElrath") testified that he was the New Orleans Police Department's "section chief for the Forensic Firearms Unit." After briefly discussing his credentials, McElrath was accepted, without objection, as an expert "in the area of firearms and ballistics analysis and identification." McElrath stated that he test-fired an AR-15 assault weapon that was brought to him from Plaquemines Parish. However, he could not ascertain whether the casings

8

recovered from the "burned-out" gold Accord were fired from the weapon because the casings were too damaged from the fire.

FBI Special Agent William Charles Williams ("Williams") testified that he was a member of the FBI's Cellular Analysis Survey Team ("CAST"). After testifying with respect to his credentials, Williams was accepted, without objection, as an expert in historical cell site analysis.

Williams stated that he was advised that the shooting took place at approximately 11:10 p.m. He was asked if the defendant's phone records showed that the defendant was in the area where the shootings occurred around 11:10 p.m. Williams tracked the defendant's phone records during the period between 10:45 p.m. and 11:14 p.m. At 10:45 p.m., the defendant's cell phone "hit" off a tower "very close to Earhardt [sic] Boulevard … within a block or two … of the old Calliope projects…." By 11:05 p.m., the cell phone records reflected that the phone was hitting or "pinging" off a tower in the uptown area of New Orleans. Between 11:05 p.m. and 11:13 p.m., there was no cell phone activity. Williams opined that based on the cell phone activity, the defendant's cell phone could have been at the intersection of Carrollton Avenue and Earhart Boulevard at the time of the shooting. Williams explained:

> [Defendant's] phone … was used just to the right or to the east of the shooting scene at 10:45. At 11:05, the phone is using a tower that services [u]ptown…. [T]hese towers are not more than a couple of miles apart from the 10:45 and the 11:05 time. And then by 11:13, the phone had moved back to the north back to the tower that it had used at 10:45.

Williams was also asked if at any time following the shooting, did the phone records reflect travel to New Orleans East, where the gold Accord was burned. Williams testified that by 11:40 p.m., the defendant's cell phones "had made it to

9

New Orleans East." Williams stated that at "roughly 12:10, the phones began utilizing towers that were closer in proximity to the burn site. And so somewhere between 12:10 and 12:53, the phones utilized the towers that were in the burn site." At approximately 1:03 a.m., both phones started moving away from the area of the burn site.

Following Williams' testimony, the parties entered into a stipulation that "[i]f Dr. Amanda Krausert were called to testify, she would testify that she was employed as a forensic pathologist by the Orleans Parish Coroner's Office in June of 2017 and would qualify as an expert in forensic pathology." The parties further stipulated that Dr. Krausert would testify that on June 16, 2017, she performed autopsies on Darrell Pollard and Terran Young and would state that "both victims died from perforating gunshot wounds to the head and torso and that their deaths were classified as a homicide by the Orleans Parish Coroner." Thereafter, the State rested.

The defendant called Detective Blaine Howard ("Howard") to the witness stand who testified that he was employed with the Jefferson Parish Sheriff's Office and that he had "no personal knowledge of the events of June 15, 2017." Howard stated that in March, 2018, he obtained a cell phone number, 504-494-5645, that he believed belonged to the defendant. Howard believed that he could contact the defendant, via the 504-494-5645 number, to purchase marijuana. However, upon calling the cell phone number that he believed belonged to the defendant, it was ascertained that the phone, in fact, did not belong to the defendant.

On cross-examination, Howard testified that before he obtained the 504-494-5645 number, he obtained a cell number, 504-344-8917, the same cell number used in investigating the June 15, 2017 shootings. Howard stated that he was able to

contact the defendant utilizing the 504-344-8917 number. Following Howard's testimony, the defense rested.

**ERRORS PATENT**

The defendant's challenge to his non-unanimous convictions pursuant to *Ramos v. Louisiana,* 590 U.S. ___, 140 S.Ct. 1390, 206 L.Ed.2d 583 (2020), which has been deemed an error patent under Louisiana law. *See, e.g.*, *State v. Monroe,* 2020-00335 (La. 6/3/20), 296 So.3d 1062. As the issue is raised as one of the defendant's assignments or error, it shall be addressed in the discussion.

**DISCUSSION**

**ASSIGNMENT OF ERROR NUMBER 1**

In his first assignment of error, the defendant contends the evidence was insufficient to support his convictions. The defendant asserts the evidence presented at trial was "wholly circumstantial" and failed to exclude every reasonable hypothesis of innocence.

The standard for review of a claim of insufficiency of the evidence was laid out by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979):

> …the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution. (Emphasis in original).

"Under the *Jackson* standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court." *State v. Williams*, 2011-0414, p.18 (La. App. 4 Cir. 2/29/12); 85 So.3d 759, 771. Further, "a factfinder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence." *Id.* But where there is no direct evidence presented proving one or more of the elements of the offense, La. R.S. 15:438 governs circumstantial evidence and provides "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." "Stated differently, the reviewer as a matter of law, can affirm the conviction only if the reasonable hypothesis is the one favorable to the state and there is no extant reasonable hypothesis of innocence." *State v. Green*, 449 So.2d 141, 144 (La. App. 4 Cir. 1984) (citing *State v. Shapiro*, 431 So.2d 372 (La. 1983)). "This test is not separate from the *Jackson* standard; rather it simply requires that 'all evidence, both direct and circumstantial, must be sufficient to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt.'" *State v. Hoang*, 2016-0479, p.3 (La. App. 4 Cir. 12/21/16), 207 So.3d 473, 475 (quoting *State v. Ortiz*, 96-1609, p. 12 (La. 10/21/97), 701 So.2d 922, 930). If a rational trier of fact reasonably rejects the defendant's hypothesis of innocence, that hypothesis falls; and, unless another one creates reasonable doubt, the defendant is guilty. *State v. Captville,* 448 So.2d 676 (La. 1984).

"A reasonable alternative hypothesis is not one 'which could explain the events in an exculpatory fashion,' but one that 'is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt'" *State v. Mack*, 2013-1311, p.9 (La. 5/7/14); 144 So. 3d 983, 989 (quoting *State v. Captville*, 448 So.2d 676, 680 (La. 1984)). Therefore, "where the evidence is

purely circumstantial, if it does not exclude every reasonable hypothesis of innocence, a rational juror cannot find defendant guilty beyond a reasonable doubt without violating constitutional due process safeguards." *State v. Monds*, 631 So.2d 536, 539 (La. App. 4 Cir. 1994).

La. R.S. 14:30.1 defines second-degree murder as the killing of a human being where "the offender has the specific intent to kill or to inflict great bodily harm." Under La. R.S. 14:27(A): "Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose."

La. R.S. 14:130.1(A) defines the crime of obstruction of justice as any of the following when committed "with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding":

> (1) Tampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding. Tampering with evidence shall include the intentional alteration, movement, removal, or addition of any object or substance either:
>> (a) At the location of any incident which the perpetrator knows or has good reason to believe will be the subject of any investigation by state, local, or United States law enforcement officers; or
>> (b) At the location of storage, transfer, or place of review of any such evidence.

The knowledge requirement of La. R.S. 14:130.1(A) is met if the perpetrator merely knows that an act "reasonably may" affect a "potential" or "future" criminal proceeding. *State v. Jones,* 2007-1052, p.9 (La. 6/3/08), 983 So.2d 95, 101. "The defendant must also have tampered with evidence 'with the specific intent of distorting the results' of a criminal investigation." *State v. Powell*, 2015-

0218, p.11 (La. App. 4 Cir. 10/28/15), 179 So.3d 721, 728 (quoting La. R.S. 14:130.1(A)(1)).

In the case at hand, defendant offers no reasonable hypothesis of innocence to overcome the evidence of guilt submitted at trial. Instead, defendant attacks the admissibility of the social media evidence submitted at trial, contending that the social media evidence was the only evidence circumstantially connecting defendant to the crimes. As shown below, the defendant's assertion in this regard is incorrect. Further, the law is clear that a review of the record for sufficiency of the evidence "encompasses all the evidence introduced at trial, inadmissible as well as admissible." *State v. Bolden,* 2011-2435, p.2 (La. 10/26/12), 108 So.3d 1159, 1161 (*per curiam*).

The defendant asserts that it was not proven that he was a member of the Ghost Gang and thus, had no motive to murder the victims who were members of the rival Byrd Gang. However, ample evidence shows the defendant is mistaken in this regard. First, based on the defendant's cell phone records, the gold Accord, which a person matching the defendant's description was seen exiting shortly after the shootings, was located directly before the shootings and directly after the shootings in the Calliope housing development, the area associated with the Ghost Gang. Second, in photographs, the defendant was pictured with known Ghost Gang members and is shown wearing a t-shirt with a Ghost Gang insignia on it. Detective Bendy's testimony in this regard, i.e., his testimony regarding known members of the Ghost Gang and that the Calliope housing development was the area where Ghost Gang members were known to reside, was based not on any social media evidence, but rather, was based upon his experience as a member of

14

the New Orleans Police Department's Homicide Division.  It was based on this same experience that Detective Bendy was aware of the "ongoing gang war" between the Ghost Gang and the Byrd Gang.  Detective Kent, based upon his experience as a member of the department's Homicide Division, testified that both murder victims were members of the rival Byrd Gang.

Evidence placing the defendant at the scene of the shooting, as well as at the scene where the gold Accord was burned, was provided by FBI Agent Williams whose testimony linked defendant's cell phones to the scene of the shootings and the scene where the gold Accord was burned.  Based on the location of the defendant's cell phone with the number, 504-344-8917, Williams was able to place defendant, or specifically, his cell phone, at the intersection of Carrollton Avenue and Earhart Boulevard at the time of the shootings.  Thereafter, Agent Williams tracked defendant's cell phone, 504-344-8917, along with a second cell phone associated with defendant, 504-577-3475, to the burn site.  Specifically, Williams testified that "somewhere between 12:10 and 12:53, the phones utilized the towers that were in the burn site."

Additional evidence linking the defendant to the crimes was the surveillance video footage showing a suspect fitting defendant's physical description exiting the gold Accord with an AK-style weapon in his hand shortly after the shootings.  While the video did not show the defendant's face, it showed his attire which was similar to the attire the defendant wore in numerous other photographs and there were other photographs depicting the defendant holding similar types of weapons pictured in the surveillance footage.  While defense counsel pointed out to jurors that the defendant's clothing in other photographs was not identical to what he was

15

wearing on the night of the murders, the majority of the photographs did show him in boots and jeans, the attire he was wearing when he exited the gold Accord, and several photographs showed the defendant wearing a headdress, just as he was wearing on the night of the murders.

In considering the defendant's claim that the circumstantial evidence presented at trial was insufficient to warrant his convictions, this Court discussed the proper standard to review cases involving circumstantial evidence in *State v. Celestain* as follows:

> [T]he Louisiana Supreme Court has recognized that in cases involving circumstantial evidence, if jurors reject a defendant's hypothesis of innocence, the defendant is guilty unless there is another hypothesis establishing a reasonable doubt of the defendant's guilt. *State v. Smith,* 12-2358, p.6-7 (La. 12/10/13), 130 So.3d 874, 878. On appellate review, the trier of fact is called upon to make certain factual findings, whose "discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law." *Id.,* 12-2358, p.7, 130 So.3d at 878 (citing *State v. Mussall,* 523 So.2d 1305, 1310 (La. 1988)). As the Louisiana Supreme Court stated, "[we] accord due deference 'to the good sense and fair-mindedness of jurors who have heard the evidence.'" *Id.* (citing *State v. Jarman,* 445 So.2d 1184, 1188 (La. 1984)).

2013-1262, p.14 (La. App. 4 Cir. 7/30/14), 146 So.3d 874, 883.

In this case, the defendant put forth no reasonable hypothesis of innocence to counter the circumstantial evidence put forth by the State, which included the cell phone evidence placing the defendant at the scene of the shootings and the scene where the gold Accord was burned. The State also submitted evidence, specifically the testimony of Detectives Kent and Bendy, attesting, based upon their experience as members of the New Orleans Police Department's Homicide Division, that there was a rivalry between the Ghost Gang and Byrd Gang.

16

Detective Kent testified that the murder victims were members of the Byrd Gang, and photographs of the defendant with Ghost Gang members and wearing a Ghost Gang t-shirt, along with the fact that a person fitting the defendant's description exited the gold Accord, associated with the shootings, in the Calliope housing development, an area where Ghost Gang members were known to reside, showed that the defendant was a member of the Ghost Gang.

The evidence reflected that the defendant, as a member of a gang in an "ongoing gang war" with a rival gang of which the murder victims were members, had a motive for the shootings. The defendant's cell phone records place him in the area where the shootings took place and where the assailants' vehicle was burned. From the burning of the vehicle, a reasonable trier of fact could conclude that defendant obstructed justice. Viewing the evidence in the light most favorable to the prosecution, the State offered sufficient evidence to support the guilty verdicts. Accordingly, the defendant's assignment of error that the evidence was insufficient to support his convictions is without merit.

**ASSIGNMENT OF ERROR NUMBER 2**

The defendant argues that the lack of a unanimous verdict in connection with his convictions violates his constitutional due process rights under the Sixth and Fourteenth Amendments to the United States Constitution. In its appellee brief, the State concedes that the defendant's contention in this regard "appears to have merit," and the State sets forth no arguments opposing defendant's position.

At the time of defendant's trial, in February, 2020, Louisiana law allowed for non-unanimous jury verdicts in felony trials. In addition, at that time, the controlling Louisiana jurisprudence consistently upheld the constitutionality of

17

non-unanimous jury verdicts.  *See State v. Bertrand,* 2008-2215 (La. 3/17/09), 6 So. 3d 738.

While defendant's appeal was pending before this Court, on April 20, 2020, the United States Supreme Court rendered its decision in *Ramos v. Louisiana,* setting forth a new constitutional rule:  the Sixth Amendment right to a jury trial, as incorporated against the states through the Fourteenth Amendment, requires a unanimous jury verdict to convict a defendant of a serious offense.  Thus, the United States Supreme Court ruled definitively that non-unanimous jury verdicts in state felony trials are unconstitutional.  Additionally, *Ramos* invalidated the non-unanimous convictions of defendants who preserved the issue for review in cases still on direct appeal.  *Ramos,* 140 S.Ct. at 1406-08; *see also Griffith v. Kentucky,* 479 U.S. 314, 328, 107 S.Ct. 708, 716, 93 L.Ed.2d 649 (1987) ("a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final"). [1]

In the instant matter, defendant specifically preserved for review the issue of the non-unanimity of his jury verdicts, having raised it in his motion for new trial.  Thus, based upon the above, the instant claim has merit.  Defendant's convictions are vacated.

**ASSIGNMENT OF ERROR NUMBER 3**

Defendant contends that all of his sentences are unconstitutionally excessive and a needless imposition of pain and suffering.  However, in light of the fact that

---

[1] On May 17, 2021, the United States Supreme Court handed down its decision in *Edwards v. Vannoy*, ___U.S.___, 141 S.Ct 1547, ___L.Ed.2nd___(2012), wherein it held that the *Ramos* jury-unanimity rule does not apply retroactively on federal collateral review.  However, state remain free, if they choose, to retroactively apply the jury-unanimity rule as a matter of state law in post-conviction proceedings.  141 S.Ct. at 1559.

defendant's convictions and respective sentences must be vacated pursuant to *Ramos, supra,* this assigned error is moot. *See State v. DeGruy,* 2020-0290, p. 6 (La. App. 4 Cir. 10/29/20), 307 So.3d 258, 263 ("This Court, having vacated and remanded DeGruy's second degree murder convictions, conspiracy to commit second degree murder conviction and the respective sentences, pursuant to *Ramos,* renders this assigned error [i.e., that the sentences were excessive,] moot as to those sentences."[2]

**CONCLUSION**

For the foregoing reasons, defendant's convictions and sentences are vacated as a result of the non-unanimous verdicts and the matter remanded for further proceedings.

**CONVICTIONS AND SENTENCES VACATED AND REMANDED**

---

[2] In *DeGruy,* the Court addressed defendant's excessive sentence claim to the extent it related to convictions to which he pled guilty, convictions which were not vacated by virtue of non-unanimous jury verdicts. But, with respect to the convictions vacated pursuant to *Ramos,* which, in this case, is all of defendant's convictions, the Court found the excessive sentence issue to be moot.